[No. S036981. Jan. 23, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN MARTIN SIMON, Defendant and Appellant.

COUNSEL

Thomas F. Coleman, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey and Sanjay T. Kumar, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BAXTER, J.**—This case arises under the Corporate Securities Law of 1968. (Corp. Code, § 25000 et seq.)[1] The principal issue is whether sections 25401 and 25540, which criminalize the sale or purchase of securities by means of oral or written communications which either contain false or misleading statements or omit material facts, create a "strict liability" offense. We also consider appellant's claims that he was prejudiced by the trial court's error in failing to instruct on the magnitude of a defendant's burden of proof when offering an "exemption" defense to a charge of violating section 25110 which prohibits the sale of unqualified securities.[2]

We conclude that failure to instruct on defendant's burden of proof of an exemption from the requirements of section 25110 was prejudicial. We

---

[1]All statutory references are to the Corporations Code unless otherwise noted.

Section 25401 provides: "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

[2]The appeal was transferred to this court pursuant to rule 27.5 of the California Rules of Court before decision by the Court of Appeal.

also conclude that the trial court erred prejudicially in instructing that sections 25401 and 25540 create an offense that does not require either (1) knowledge of the false or misleading nature of a representation or of the materiality of an omission, or (2) criminal negligence in failing to acquire such knowledge. The judgment must, therefore, be reversed.

I

BACKGROUND

Appellant was convicted by a jury of seven counts of selling unqualified securities in violation of section 25110[3] and five counts of selling securities by means of false statements or omissions in violation of section 25401. ██ ██ ██ charges were based on transactions in which appellant or his employee agents sold interests in promissory notes[4] and limited partnerships which appellant created and in which he or Vesper Corporation was the general partner. The actual offeror of the partnership interests was Vesper Corporation, doing business as Clergy Tax and Financial Services. Appellant was the president and primary shareholder of Vesper Corporation and was the manager of its operations. Appellant stipulated that "John Simon is Clergy Tax. He owns Clergy Tax and all of these limited partnerships he was responsible for to manage and direct."

Through Vesper Corporation appellant formed 47 partnerships for the purpose of purchasing, managing, and reselling real property. Nineteen were formed for the purpose of loaning funds to other partnerships. In all, there were 66 limited partnerships in which 870 people had invested a total of $11,449,883. The sales in the counts on which appellant was convicted[5] were made between 1980 and 1985 to eight persons for whom appellant and his employees in Clergy Tax and Financial Services had prepared income tax returns. None of the limited partnerships was qualified pursuant to sections

---

[3]Section 25110 provides: "It is unlawful for any person to offer or sell in this state any security in an issuer transaction (other than in a transaction subject to Section 25120), whether or not by or through underwriters, unless such sale has been qualified under Section 25111, 25112 or 25113 (and no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification) or unless such security or transaction is exempted under Chapter 1 (commencing with Section 25100) of this part. . . ."

[4]Unsecured promissory notes are securities if the investor relies on the skill, services, solvency, success, and services of the issuer to ensure payment.

[5]At the close of the People's case the judge granted a motion for acquittal (Pen. Code, § 1118.1) on six counts. Appellant was acquitted by the jury on 20 counts. The jury deadlocked on five counts which were subsequently dismissed on motion of the prosecutor. Appellant was not convicted on any of several counts alleging grand theft (Pen. Code, § 487, former subd. 1) from the same victims or on the one count alleging fraudulent practices (§ 25541).

25111, 25112, or 25113. Appellant believed that his preexisting relationship with the investors as their tax preparer exempted the securities from the qualification requirement.

Appellant was involved in all aspects of establishing and managing the limited partnerships, but made only two of the direct sales of interests in them to the investors in the counts of which he was convicted. The others were sold by his employees. The employees did not tell the investors of the risks, and only after making the investment did some receive a prospectus which did disclose that the investment was in a speculative security with a high degree of risk. Appellant minimized the risks, telling one investor that the prospects for a partnership project were more positive than disclosed in the prospectus and that a risk disclaimer in the prospectus was present only because it was required in all limited partnership prospectuses.

Evidence at trial showed that money was usually obtained from investors before property was purchased for a limited partnership and was held in a money market account. Appellant authorized the opening of escrow accounts and was aware of all purchases of property by the limited partnerships. He negotiated the purchase price and down payment, and he authorized the transfer of money from a partnership to make the purchase.

While appellant's employees were instructed to advise investors regarding some risks, they were not told to advise the investors that money from the partnership in which they invested might be loaned to other partnerships or used to finance the operation of Clergy Tax and Financial Services. Appellant testified that he believed that, as general partner in each of the partnerships, he had the authority to make the loans and did so when a partnership had excess cash or a cash flow problem because a lending partnership could earn higher interest and a borrowing partnership would pay lower interest than either would if it dealt with an outside lender. Substantially all of the omissions to disclose material facts were related to loans made between the real estate partnerships after the buyers had invested money. The jury necessarily concluded that this information was material and should have been disclosed to each investor.

The court did not instruct the jury that knowledge of the falsity of statements or misleading nature of omissions in communications with a prospective investor is a necessary element of the section 25401 offense. It ruled instead that section 25401 created a strict liability offense in which scienter or knowledge is not an element and instructed the jury: (1) that the actor's intent or knowledge at the time a material representation is made is irrelevant; (2) that only a general intent to commit the proscribed act was

required; and (3) that if later events make a representation untrue that section is violated. The complete instruction was:

"Where the defendant makes a material representation about conduct in the future, he must act in accordance with the representation irrespective of what his intent or knowledge was at the time the representation was made.

"If his later act makes the statement as promised untrue, he may be found in violation of Section 25401.

"In the crime of willfully offering or selling a security by means of a material misrepresentation or omitting to state a material fact (Corporations Code Section 25401), a general criminal intent need only be shown. 'When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent—even though he may not know that his act or conduct is unlawful.' "

In the instructions on section 25110, the jury was told that a defendant has the burden of proof that securities are exempt from the qualification requirement of section 25110. However, the court did not advise the jury that this burden was met if the defendant offered enough evidence that an exemption applied to raise a reasonable doubt that registration of the limited partnership interests was required by the Corporate Securities Law of 1968.

Appellant contends that these instructions were erroneous.

II

SECTION 25110: BURDEN OF PROOF

█ A limited partnership interest may be a security as defined by section 25019 of the Corporate Securities Law of 1968 (§ 25000 et seq.) because the investor provides capital that will be risked in the enterprise and is not involved in management. (*Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135]; *People* v. *Graham* (1985) 163 Cal.App.3d 1159, 1168 [210 Cal.Rptr. 318]; see also Comment, *Limited Partnerships and the California Securities Law: Restricting the Public Sale of Limited Partnership Interests* (1980) 13 U.C. Davis L.Rev. 618; Comment, *Is a Limited Partnership Interest a 'Security'?: The Current State of the California and Federal Definitions Add a Legal Dimension to Economic Speculation* (1976) 16 Santa Clara L.Rev. 311.)

█ Section 25110 makes it illegal to sell an unqualified security unless the *security* itself, not the individual sale, is exempt. Therefore, a security

alleged to be exempt under subdivision (f) of section 25102 because it was sold only to persons with whom the issuer had a prior business or personal relationship is not exempt if an interest in that security is sold to any person who does not meet that qualification. ■ Appellant does not contest the characterization of the limited partnership interests he and his employees sold as unqualified securities. He claimed at trial, however, that the sales were exempt from qualification because all were made to persons with whom he and/or Clergy Tax and Financial Service had a preexisting personal or business relationship.[6]

Section 25102, subdivision (f), presently creates the exemption on which appellant relied. It applies if the sales of securities are to no more than 35 persons each of whom represents that he or she is purchasing for his or her own account and not for sale, the sale is not made through publication of an advertisement, and if the "purchasers either have a preexisting personal or business relationship with the offeror or any of its partners, officers, directors or controlling persons, or by reason of their business or financial experience or the business or financial experience of their professional advisors who are unaffiliated with and who are not compensated by the issuer or any affiliate or selling agent of the issuer, directly or indirectly, could be reasonably assumed to have the capacity to protect their own interests in connection with the transaction."

Some of the sales involved in this prosecution were made prior to November 1, 1981. Prior to that date, subdivision (f) of section 25102 created an exemption for "[a]ny offer or sale, in a transaction not involving any public offering, of any bona fide general partnership, joint venture or limited partnership interest . . . ." (Stats. 1979, ch. 665, § 1.7, p. 2042.) Under the statute as it then read and the implementing regulation (former rule 260.102.2, Rules of Comr. of Corp.; see now tit. 10, Cal. Code Regs., § 260.102.12; all references to rules are to these rules), a defendant could claim an exemption if the offer was to no more than 25 persons with sales to no more than 10 of those persons by showing only that the offering or sale was not a "public offering" because it was to persons with whom the issuer of the security had a preexisting personal or business relationship. (*People* v. *Feno* (1984) 154 Cal.App.3d 719, 732 [201 Cal.Rptr. 513].)[7]

The Corporate Securities Law of 1968 assigns the burden of proving an exemption to defendants. Section 25163 provides: "In any proceeding under

---

[6]Respondent does not claim that the limited partnerships or notes sold to the persons named in the counts of which appellant was convicted were nonexempt because interests in them had been sold to other persons who did not have the requisite prior relationship with the offeror.

[7]Even though some of the sales of unqualified securities of which appellant was convicted allegedly were made prior to November 1, 1981, the date on which the amendment of subdivision (f) of section 25102 became effective, the court instructed only in the language of the amended statute.

This error had the effect of making the appellant's burden greater than it had been under the pre-November 1, 1981, version of the statute inasmuch as he was required to show also that

this law, the burden of proving an exemption or an exception from a definition is upon the person claiming it." Because an exemption defense is not collateral to the defendant's guilt of a charge of selling unqualified securities, however, a defendant's burden is only to raise a reasonable doubt that the defendant sold nonexempt securities. (Evid. Code, § 501; Pen. Code, § 1096; *People* v. *Figueroa* (1986) 41 Cal.3d 714, 722 [224 Cal.Rptr. 719, 715 P.2d 680].)

The trial court is required to instruct the jury on which party has the burden of proof *and* on the nature of that burden. "The court on all proper occasions shall instruct the jury as to which party bears the burden of proof on each issue *and as to whether that burden requires that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt.*" (Evid. Code, § 502, italics added.) ■ The requirement that the court instruct on the nature of the burden of proof applies to an exemption defense in a corporate securities prosecution. (*People* v. *Figueroa, supra,* 41 Cal.3d 714, 722.)

■ The court instructed the jury that section 25110 makes it unlawful to offer or sell an unqualified security unless the security is exempt. The only instruction regarding the burden of proof was: "The burden of proving an exemption is upon the defendant."

Appellant contends that the trial court committed reversible error in failing to instruct the jury that his burden was only to raise a reasonable doubt that the securities were not exempt. He notes that the state of the evidence on the question of whether the limited partnership interests he sold were exempt from qualification was such that he was acquitted on four of the counts charging violation of section 25110, and the jury deadlocked on a fifth count. Inasmuch as each count involved the relationship and circumstances of a different investor, however, the acquittal and deadlock on some

the investor had represented that he or she was purchasing the security for the investor's own account and not with a view to sale in connection with any distribution of the security, and that the offer and sale was not accomplished by publication of any advertisement.

On retrial, the court should distinguish the counts alleging pre- and post-November 1, 1981, sales and instruct accordingly to avoid a possibly prejudicial ex post facto application of the amended version of the statute. (See *Miller* v. *Florida* (1987) 482 U.S. 423, 429-430 [96 L.Ed.2d 351, 359-360, 107 S.Ct. 2446]). Because we conclude that the error in failing to instruct on the nature of the defendant's burden of proof was prejudicial with respect to all of the section 25110 convictions, we need not consider the impact on the verdicts, if any, of the trial court's failure to instruct under the pre-November 1, 1981, version of the exemption.

counts does not itself establish that the case was close with respect to the counts on which appellant was convicted.

The People concede that the court erred, but argue that those counts were not close and the error does not require reversal. We disagree. When the evidence is considered in light of the instructions actually given by the court, it is probable that a result more favorable to appellant would have ensued had the jury been instructed that appellant's burden was only to raise a reasonable doubt in the minds of the jurors that he sold unqualified securities, i.e., a reasonable doubt that the limited partnership interests he sold were not exempt.

The trial court instructed in the statutory language on exemption from the qualification requirement. Appellant relied on the exemption for sales made to persons with whom the offeror or an officer, director, or controlling person of the offeror had a preexisting business relationship. No instruction was given on the nature of the relationship necessary to satisfy the statute.[8] Therefore appellant had only to show that the investors had a prior business

---

[8]Section 25102, subdivision (f), does not further define the "personal" or "business" relationship between the issuer and the purchasers of a security which is necessary to claim this exemption from the qualification requirement. Rule 260.102.12(d)(1) provides, however, that " 'preexisting personal or business relationship' includes any relationship consisting of personal or business contacts of a nature and duration such as would enable a reasonably prudent purchaser to be aware of the character, business acumen and general business and financial circumstances of the person with whom such relationship exists." The rule also provides that its description of the nature of the required relationship does not create a presumption that other relationships are not within the statutory definition and any determination of whether the statutorily defined relationship exists is to be made without reference to the subsection.

Notwithstanding the rule's disclaimer, rule 260.102.12(d)(1) describes the nature of the relationship contemplated by section 25102. The relationship described in the rule contemplates more than mere acquaintance. If the qualification requirement is to serve the purpose of the corporate securities law, which is to protect unsophisticated investors (*Southern Cal. First Nat. Bank* v. *Quincy Cass Associates* (1970) 3 Cal.3d 667, 675 [91 Cal.Rptr. 605, 478 P.2d 37]), the relationship must be one of sufficient duration and nature that the offeror of a security has reason to believe the investor is able to assess the issuer's honesty and competence. (See 1 Marsh & Volk, Practice under the Cal. Securities Laws (rev. ed. 1994) § 402A[2] [c], p. 4-28.8(1) [hereafter Marsh & Volk].) The guidelines suggested by the rule are consistent with that purpose. We do not rule out the possibility that other types of relationships may form a basis on which an investor would be warranted in relying on a person who offers or sells unqualified securities to the investor.

Whether a prior relationship warranting reliance on the seller of an unregistered security exists is an objective test and looks to what a reasonably prudent investor would be aware of about the offeror from the prior personal or business relationship. This test is intended to protect investors by placing on the offeror the burden of establishing that the nature and duration of the relationship is one that would enable a reasonably prudent investor to assess

relationship with him or with Clergy Tax and Financial Services. In this case, because Vesper Corporation was the issuer of the securities and defendant was a director, officer, and controlling person of Vesper Corporation, the required relationship could be with either appellant or Vesper Corporation, which did business as Clergy Tax and Financial Services. All of the persons to whom appellant sold limited partnership interests were clients of Clergy Tax and Financial Services. The evidence regarding the prior relationships between appellant or Clergy Tax and Financial Services and the purchasers named in the counts in which he was convicted of violating section 25110 is as follows:

The investor in count I, Norma Nordstrom, met appellant in October 1986. Her tax return was prepared by his employee Keith Gunther in 1980 and subsequent years. In February 1985 she asked Gunther about making investments. Ms. Nordstrom invested $10,000 in the "Hesperia 19" limited partnership. At that point she had not met appellant, had never heard of Vesper Corporation, and was unaware that appellant had any connection to Clergy Tax and Financial Services or Vesper Corporation. Appellant had no personal contact with her. There was evidence of a prior business relationship of five years' duration with Clergy Tax and Financial Services at the time she made her investment, however.

Janet Taylor (count VII) was referred to Clergy Tax and Financial Services for tax return preparation in 1983 by her minister, a friend of defendant. In April 1983, she met appellant, who introduced her to an employee assigned to prepare her tax return. She spoke with appellant for an hour at the most. They discussed Ms. Taylor's friend and what appellant had done with the friend's finances. In June 1983, that employee spoke with Ms. Taylor about investing in limited partnerships. He came to her home and she invested $5,000 in the "University Center Investors" limited partnership. She knew that appellant was to be the general partner who managed the partnership. She had heard of Vesper Corporation and in her mind appellant, Clergy Tax and Financial Services and Vesper Corporation were "synonymous." She also invested $5,000 in the "Adelanto III" limited partnership in June 1983. Appellant did not recall meeting personally with Ms. Taylor, and as of June 1983 she had been to the Clergy Tax and Financial Services office only once, in April 1983 for tax return preparation. Again there was evidence of a business relationship with Clergy Tax and Financial services and with appellant.

Neal Shaver (count X) employed Clergy Tax and Financial Services to prepare his tax returns in 1983 and again in 1984. He met with an employee

---

the general business and financial circumstances of the issuer. (See Marsh & Volk, *op. cit. supra*, § 402A[2] [c] [ii], p. 4-28.9.)

Because the jury was not instructed that this test should be applied, it does not enter into our assessment of whether appellant was prejudiced by the error in the instructions actually given.

who prepared the tax returns for Shaver and his wife. In 1984 the employee told Shaver about one of the limited partnerships. In July 1984 Shaver invested $7,000 in the "Commercial Investors II" partnership. In August 1984 he invested another $5,000. In September 1984 he invested $30,000 in the "Commercial Income Investors IV" partnership. He knew that appellant would be the general partner in these partnerships, but he first met appellant in 1985. He dealt only with the employee. Appellant did not recall meeting personally with Shaver. There was evidence therefore that Shaver had a prior business relationship of more than a year's duration with Clergy Tax and Financial Services when he made his first purchase and that relationship extended to the time he made his subsequent purchases.

Verlyne Evers (count XIII) first met appellant in 1980 and after that time employees of Clergy Tax and Financial Services prepared her taxes. An employee discussed investing with her and her first investment was a $37,000 interest in the "Reeves Street" partnership in November 1980. She also invested in the "El Cajon" partnership during that month. In March 1981 she invested in "Victorville Investors." In February 1983 she invested in "Adelanto 20." In May 1984, she and her husband invested $81,130 of his retirement check in "Commercial Income Investors II." Ms. Evers knew that appellant owned and was in charge of Clergy Tax and Financial Services and would manage the limited partnerships, but she did not discuss investments with appellant. All of the investments were handled by an employee. The evidence was such that the jury could believe that she, too, had an existing business relationship with Clergy Tax and Financial Services at the time of the first purchase and that the relationship continued through the time she made her last purchase.

Duane Tellinghuisen (count XXV) met appellant in 1969 when he went to Clergy Tax and Financial Services to have his tax returns prepared. He continued to have his tax returns prepared by Clergy Tax and Financial Services until 1986, but appellant did not personally prepare them each year. Four other employees did them during that time. Tellinghuisen built a relationship of confidence and trust in appellant's preparation of tax returns, but had no other business dealings with appellant. In 1980 one of appellant's employees mentioned investment opportunities to Tellinghuisen. He had had no business dealings other than tax preparation with Clergy Tax and Financial Services prior to 1980. In February 1980 he invested $5,000 in what he believed was the "Olive Street" limited partnership. He was told that appellant would manage the limited partnership. He had heard of Vesper Corporation and believed that appellant was managing it as a separate corporation. In June 1983, he invested $12,250 in the "Adelanto 20" limited partnership. The jury could have believed that this investor had a prior business relationship with Clergy Tax and Financial Services of more than 10 years' duration when he made his first purchase.

Cecil Gates (count XVI) met a Clergy Tax and Financial Services employee at a 1979 seminar and regularly had his tax returns prepared by that employee. He was contacted by the employee in 1981 about investing in one of the limited partnerships. In October and December 1981, he invested $10,000 in the "Lakewood Ltd." limited partnership. In early 1982, he invested $6,000 in the "Victorville Investors" limited partnership. Additional sums were invested in subsequent years when "assessments" were made. Gates had no personal contact with appellant until August or September 1986, but the evidence was of a business relationship with Clergy Tax and Financial Services.

Caroline French was the victim in count IV. She and her husband met appellant in 1974 to have their tax returns prepared. He personally prepared tax returns for Mrs. French until the business expanded and another person was assigned to prepare them. Mr. and Mrs. French also met with various employees of Clergy Tax and Financial Services. When doing financial planning, they invested in annuities with an outside company recommended by defendant. In 1980, when Ms. French received an inheritance, she and her husband sought help with investments from appellant. In October 1980, she invested $10,000 in a promissory note which appellant said would be a loan to him as he entered the "Elizabeth Gardens" partnership. She also invested $12,000 in the "Aloha Gardens" partnership at that time. Ms. French testified that she and her husband had "ongoing" contacts with appellant, who was their financial advisor from the time he first prepared their tax returns until they made their investments in 1980. Appellant testified that he had many business contacts with Mrs. French. On this count there was evidence of a prior business relationship with both appellant and Clergy Tax and Financial Services.

Some of these investors did not deal with appellant personally. They had done business with Clergy Tax and Financial Services, however. Although some were not aware that their business relationship was with Vesper Corporation, since the corporation did business only under the name of Clergy Tax and Financial Services, the relationship with the issuer of the securities existed. The evidence was such that a properly instructed jury could believe that the prior business relationship between those investors and Clergy Tax and Financial Services might qualify the sales to these investors for the exemption. The jury could also believe that Mrs. French had a prior business relationship with appellant personally, so as to qualify the sale to her for the exemption. If so, the jury might well have had a reasonable doubt that the securities were not exempt.

The possibility that the jury, if properly instructed, might have had a reasonable doubt that the securities sold to these investors were nonexempt

is strong because, in addition to above the evidence regarding the purchasers' business relationships with appellant and/or Clergy Tax and Financial Services, defendant offered the testimony of an attorney expert who handled matters subject to subdivision (f) of section 25102 on a regular basis. She testified that in her opinion a person who is referred to a tax preparer with an indication that the tax preparer has a good reputation for doing tax returns, submits relevant personal information to the preparer, is given good tax planning advice with special knowledge of the individual's circumstances, and comes back year after year, during which period the individual sees the tax preparation business growing and seemingly successful, is a person who satisfies the "preexisting relationship" test of the statute.[9]

In assessing the prejudicial impact of the court's failure to instruct that appellant's burden was only to offer evidence of a prior business relationship with appellant and/or Vesper Corporation sufficient to raise a reasonable doubt in the jurors' minds as to whether he sold securities that were not exempt, we consider the instructions that were given and the evidence of prior relationships. There was evidence of contacts between the investors and appellant and/or Vesper Corporation doing business as Clergy Tax and Financial Services which could establish an exemption in each case. That evidence was unrebutted. We conclude therefore that it is reasonably probable that an outcome more favorable to appellant might have been reached had the jury been properly instructed that appellant's burden was only to raise a reasonable doubt that the securities he sold were not exempt.[10] (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].)[11] The error was prejudicial and necessitates reversal of the judgment entered on each of the counts of violating section 25110.

[9]Our consideration of this evidence in assessing prejudice does not signal approval of admission of expert testimony on legal questions—here the nature of the relationship required by statute to claim an exemption.

[10]We have reviewed the arguments of counsel in an effort to determine if the nature of the burden might have been conveyed to the jury during closing argument. It was not. If anything, the argument would have led the jury to believe that appellant had to do more than raise a reasonable doubt as to whether the securities appellant sold were exempt.

The prosecutor repeated the judge's advice that the defendant "has to prove that he was exempt from the provisions of 25110. If he does not prove that he was exempt and you believe that I have proven all these elements beyond a reasonable doubt, you must find the defendant guilty even though he never intended to violate the law." Later he again told the jury that the "defendant has to prove that the person he's dealing with when he's selling them the security is one, a sophisticated investor or they have a business relationship to the offeror." Defense counsel did not address the burden during closing argument.

[11]Because we conclude that reversal is required under *People* v. *Watson, supra,* 46 Cal.2d 818, 836-837, we need not decide here whether the error in omitting the instruction of the defendant's burden is one of federal constitutional dimension that necessitates application of the *Chapman* test for reversible error. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

## III

### SECTIONS 25401 AND 25540: MENS REA OR SCIENTER

■ Do sections 25401 and 25540 create a "strict liability" offense? Section 25401 itself does not expressly require knowledge of the false or misleading nature of a statement or omission to disclose, made in the sale of a security, as an element of the unlawful act it defines. The criminal penalty for violation of section 24501 is found in section 25540 which, at the time of the offenses with which defendant is charged, included a requirement that the conduct be "willful." At the time of the offenses it provided: "Any person who willfully violates any provision of this law [including section 25401], or who willfully violates any rule or order under this law, shall upon conviction be fined not more than ten thousand dollars ($10,000) or imprisoned in the state prison, or in a county jail for not more than one year, or be punished by both such fine and imprisonment; but no person may be imprisoned for the violation of any rule or order if he proves that he had no knowledge of the rule or order." (§ 25540, as amended by Stats. 1977, ch. 165, § 1, p. 639.)

In *People* v. *Johnson* (1989) 213 Cal.App.3d 1369 [262 Cal.Rptr. 366] (*Johnson*), the Court of Appeal considered these provisions and the federal securities laws after which the Corporate Securities Law of 1968 was patterned, and concluded that, notwithstanding the "willful" requirement in section 25540, the California Legislature did not intend to make knowledge of the falsity of a statement an element of the offense of selling securities by means of false or misleading statements.

In *Johnson*, as here, interests in limited partnerships which were formed for the purpose of constructing and managing property were sold as unqualified securities. When unanticipated increases in the costs of construction were experienced, and partnership funds were inadequate to cover the increased expenses, funds were "temporarily" transferred among the partnerships to meet cash flow needs. The defendant, who was the issuer and general partner, had not advised investors that such transfers would be made and had told those who inquired that the funds would not be commingled. The trial court did not instruct that a violation of section 25401 requires "scienter," i.e., guilty knowledge at the time the representation or omission occurs. The Court of Appeal affirmed the conviction, holding that although California's securities law is patterned after the Securities Act of 1933 (1933 Act) (15 U.S.C. § 77a et seq.), which had been construed in *United States* v. *Koenig* (S.D.N.Y. 1974) 388 F.Supp. 670, 712, as requiring proof that the defendant knew of the falsity of his representations or acted with reckless

disregard for the truth, the California Legislature intended section 25401 to apply to any willful conduct and did not make knowledge of the falsity of a statement an element of the offense.

The *Johnson* court explained: "It is settled that the omission of 'knowingly' from a penal statute indicates that guilty knowledge is not an element of the offense. (*People* v. *Kuhn* (1963) 216 Cal.App.2d 695, 699 [31 Cal.Rptr. 253].) Had the Legislature intended to require proof of guilty knowledge or scienter under section 25540, it could have so stated by using the word 'knowingly.' Willfulness does not require proof of evil motive or intent to violate the law or knowledge of illegality. (*People* v. *Clem* (1974) 39 Cal.App.3d 539, 542-543 [114 Cal.Rptr. 359]—according to legislative history of § 25540, evidence of good faith or advice of counsel is not a defense; *People* v. *Gonda* (1982) 138 Cal.App.3d 774, 779 [188 Cal.Rptr. 295]—lack of knowledge of illegality is not a defense to violation of law regulating sale of franchise.)" (*Johnson, supra,* 213 Cal.App.3d 1369, 1375.) *Johnson* has been followed in *People* v. *Baumgart* (1990) 218 Cal.App.3d 1207, 1219 [267 Cal.Rptr. 534].)

Appellant's defense to the section 25401 charges was that he had instructed all of his employees to go over the prospectus for the partnership in which an investor was interested line by line and to explain the risk factors to them. He did this himself. The problems with the partnerships arose after the sales were made and they were unanticipated at the time of the sales. Although some of the limited partnership agreements did not give the general partner express authority to lend partnership property, that power was included in others in the mid-1980's. The loans of money between partnerships were made when problems that were unforeseen at the time the investors acquired their interests developed, leaving some partnerships "asset rich," but "cash poor."

Appellant contends that a criminal violation of section 25401, by making an untrue statement of a material fact or omitting a material fact regarding a security being offered for sale or sold, occurs only if the defendant knew or should have known that the statement was untrue or misleading or the omission material, and that this must be determined in light of the circumstances existing at the time of the offer or sale of the security. On that basis he argues that the court erred in instructing the jury that if a defendant makes a material representation about future conduct, he must act in accordance with the representation regardless of his intent or knowledge at the time the representation was made, and that if a later act makes the representation untrue, a violation has occurred. He concedes that the trial court was bound by *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455-456

[20 Cal.Rptr. 321, 369 P.2d 937], to follow *Johnson, supra,* 213 Cal.App.3d 1369, but argues that *Johnson* was wrongly decided. We agree.

Appellant's argument that *Johnson* failed to properly construe section 25401 is based on the history of sections 25401 and 25540, and on construction of the federal securities law after which these sections were patterned. Our conclusion rests on those factors and on the Legislature's requirement of guilty knowledge before civil liability may attach under section 25501.[12]

Neither the language and history of section 25540 nor reference to the federal law after which section 25401 was patterned resolves this question since violations of section 25401 may be the basis for administrative or civil, as well as penal, sanctions. In ascertaining legislative intent in this case we must look to the entire regulatory scheme of the Corporate Securities Law of 1968 and to the place in the regulatory hierarchy into which a criminal violation of section 25401 falls. The *Johnson* court relied principally on the language of section 25540. It did not consider the full regulatory scheme. We do so after also considering other indicia of legislative intent.

The legislative intent underlying section 25540 does not itself answer the question we face here because the penalties that section prescribes apply to criminal violations of *any* provision of the Corporate Securities Law of 1968, including violations of rules or orders promulgated under that law or of which the violator had knowledge. We hesitate to assume that the Legislature intended that scienter be an element of every regulatory aspect of the Corporate Securities Law of 1968.[13]

Section 25540 is modeled after section 32(a) of the Securities Exchange Act of 1934 (1934 Act) (15 U.S.C. § 78a et seq.). (Marsh & Volk, *op. cit.*

---

[12]Section 25501 permits an action for rescission or damages by a person who purchases a security sold in violation of section 25401. The plaintiff who establishes a violation may rescind and recover the consideration paid plus interest, or damages if he or she no longer owns the security, "unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission." (§ 25501.) Sections 25401 and 25501 were enacted as part of the same legislation. (Stats. 1968, ch. 88, § 2, pp. 279-280.)

[13]This reluctance is tempered somewhat by recognition that the Legislature has now attached extremely heavy penalties to criminal violations of some provisions of the Corporate Securities Law of 1968. In a 1993 amendment of section 25540 the Legislature increased the maximum fine for most violations to $1 million, and for violations of sections 25400, 25401, 25402, and 25403, to $10 million. (Stats. 1993, ch. 723, § 2; Stats. 1993, ch. 762, § 2.5.) In 1988, the term of imprisonment was increased to a term of two, three, or five years, with no county jail option. (Stats. 1988, ch. 1339, § 5, p. 4431.)

We generally presume that the Legislature would not attach a substantial penalty to a strict liability offense. "Harsh penalties" are a " 'significant consideration in determining whether the statute should be construed as dispensing with mens rea.' " (*United States* v. *X-Citement Video, Inc.* (1994) __ U.S. __, __ [130 L.Ed.2d 372, 380, 115 S.Ct. 464, 468]; *Staples* v. *United*

*supra*, p. 14-79.)[14] Sections 25401 and 25501, which authorizes private civil actions for violation of section 25401, are modeled after provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. ( Marsh & Volk, *op. cit. supra*, p. 14-4.) Section 12(2) of the 1933 Act (15 U.S.C. § 77*l*) creates civil liability for sellers who make false and misleading statements in the sale of securities. Unlike section 25401, however, section 12(2) of the federal act includes an express scienter provision, placing the burden on the defendant to prove lack of knowledge of an untruth or omission of a material fact. It provides: "Any person who— [¶] . . . [¶] (2) offers or sells a security (whether or not exempted . . .) by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security . . . ." (15 U.S.C. § 77*l*.)

Notwithstanding the provision of an express affirmative defense of lack of knowledge, section 12(2) of the 1933 Act has been construed as creating strict liability and permitting recovery for negligent misrepresentations. (*Drexel Burnham Lambert Group* v. *Microgenesys* (S.D.N.Y. 1991) 775 F.Supp. 660; *Basile* v. *Merrill Lynch, Pierce, Fenner & Smith* (S.D. Ohio 1982) 551 F.Supp. 580; *Banton* v. *Hackney* (Ala. 1989) 557 So.2d 807.) The decisions which have read the scienter defense out of the statute postdate the 1968 adoption of the California Corporate Securities Law of 1968, of which section 25401 is a part, however, and would not support an inference the

*States* (1994) 511 U.S. __, __ [128 L.Ed.2d 608, 623, 114 S.Ct. 1793, 1802].) Even the initial penalty, a term of up to 10 years' imprisonment and/or a $15,000 fine (Stats. 1968, ch. 88, § 2, p. 285), was significant. Although, for the reason stated, we do not rely on the penalty authorized by section 25540 as dispositive, the 1993 amendment strongly implies a current legislative understanding that neither section 24501 nor those other regulatory provisions of the Corporate Securities Law of 1968 create a strict liability offense.

We encourage the Legislature to clarify which of the criminal violations of the Corporate Securities Law of 1968 that are punishable under either subdivision (a) or (b) of section 25540 are strict liability offenses and what mental states are elements of those which require scienter.

[14]Section 32(a), as codified at 15 United States Code section 78ff, now reads in relevant part: "Any person who willfully violates any provision of this title . . . or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this title . . . shall upon conviction be fined . . . or imprisoned . . . or both . . . ; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation."

California Legislature intended that section 25401 state a strict liability offense at the time our law was enacted.

Since those decisions were handed down, moreover, the United States Court of Appeals for the Ninth Circuit has held, consistent with the language of section 12(2) of the 1933 Act, that liability exists only if the seller knew or should have known the representations were false. (*Casella* v. *Webb* (9th Cir. 1989) 883 F.2d 805; see also *Odette* v. *Shearson, Hammill & Co., Inc.* (S.D. N.Y. 1975) 394 F.Supp. 946.)

Section 10(b) of the 1934 Act makes it unlawful "for any person, directly or indirectly, . . . [¶] . . . . [¶] (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe . . . ." (15 U.S.C. § 78j.) Rule 10b-5, adopted under this statute, provides in section (b) that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security." (17 C.F.R. § 240.10b-5 (1994).)

Appellant seeks to invoke the rule that when a state statute is modeled on a federal statute we presume that the Legislature intended to adopt the construction employed by the federal courts. (*Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 688-689 [8 Cal.Rptr. 1, 355 P.2d 905].) He misstates the rule, however, and it cannot be reliably applied here. The rule applies to statutes enacted *subsequent* to judicial construction of the federal act. (*Id.*, at p. 688.) Not only is the language of section 25401 materially different from that of section 10(b) of the 1934 Act, but there was no settled construction of the federal statute or rule 10b-5, which was adopted under it, at the time section 25401 was enacted.

At that time, in what was then a leading case construing rule 10b-5, the United States Court of Appeals for the Second Circuit had held that scienter was unnecessary to obtain *injunctive* relief against misleading statements by a corporation and left open the possibility that damages could be recovered for misstatements made negligently. (*Securities and Exchange Com'n* v. *Texas Gulf Sulphur Co.* (2d Cir. 1968) 401 F.2d 833 [2 A.L.R.Fed. 190].) Judge Friendly, concurring, criticized the majority for suggesting that possibility. (*Id.*, at p. 866; see also Note, *Securities Acts* (1969) 82 Harv.L.Rev.

938; Comment, *Negligent Misrepresentations Under Rule 10b-5* (1965) 32 U. Chi. L.Rev. 824 ["There is, however, no agreement on what the substantive elements of a 10b-5(2) private action, particularly with respect to the elements of scienter and reliance, should be."].) This holding throws little light on what the California Legislature intended with regard to criminal violations of section 25401. As we shall discuss below, injunctive relief against future violations of a regulatory statute may be had even where the absence of mens rea precludes imposition of criminal sanctions for past violations.

The United States Supreme Court has now construed section 10(b) of the 1934 Act (15 U.S.C. § 78j) and rule 10b-5, promulgated by the Securities and Exchange Commission under that section, as including a scienter element. In *Ernst & Ernst* v. *Hochfelder* (1976) 425 U.S. 185 [47 L.Ed.2d 668, 96 S.Ct. 1375], the court held that negligent acts were not a basis for liability under section 10(b) of the 1934 Act. The court reasoned that Congress's use of the terms "manipulative or deceptive" in the statute suggested that the intent was "to proscribe knowing or intentional misconduct." (425 U.S. at p. 197 [47 L.Ed.2d at p. 679].) It followed that the scope of the conduct proscribed by rule 10b-5 could be no broader than that covered by section 10(b) of the 1934 Act. The court reaffirmed that conclusion in *Central Bank* v. *First Interstate Bank* (1994) __ U.S. __ [128 L.Ed.2d 119, 114 S.Ct. 1439].) Since section 25401 does not use the term "manipulative or deceptive," however, that construction of section 10(b) of the 1934 Act and of the language of rule 10b-5 does not necessarily reflect the legislative intent underlying section 25401, even though the wording of section 25401 otherwise follows that of rule 10b-5. And, since *Ernst & Ernst* v. *Hochfelder, supra*, 425 U.S. 185, was decided after the Corporate Securities Law of 1968 was adopted, the Legislature cannot be presumed to have been aware that the language taken from rule 10b-5 had been authoritatively construed as requiring knowing or intentional misconduct.

If *Ernst & Ernst* v. *Hochfelder, supra*, 425 U.S. 185, teaches anything, it is that as of 1968 when the lawsuit leading to that decision was filed, some courts had construed section 10(b) of the 1934 Act as permitting recovery for negligent misrepresentation. And, when the case was argued before the high court in 1975, the Securities and Exchange Commission, as amicus curiae, argued that Congress intended to bar all false and deceptive practices regardless of whether the conduct was negligent or intentional. (425 U.S. at p. 198 [47 L.Ed.2d at pp. 679-680].) The most that can be said with regard to the 1968 understanding of the rule 10b-5 language is that said by the high court: "Courts and commentators long have differed with regard to whether scienter is a necessary element of such a cause of action, or whether

negligent conduct alone is sufficient." (425 U.S. at p. 197 [47 L.Ed.2d at p. 679], fn. omitted.)

Section 32(a) of the 1934 Act, which, like section 25540, establishes penalties for "willful" violations of securities laws and regulations, has been construed by some federal courts as requiring scienter. One decision holds that a plaintiff must show both that the defendant intended to do the proscribed act and that he or she was aware that it was wrongful, even though he or she did not know that it was unlawful, in order to establish the defendant acted "willfully." (*United States* v. *Chiarella* (2d Cir. 1978) 588 F.2d 1358, revd. on other grounds (1980) 445 U.S. 222 [63 L.Ed.2d 348, 100 S.Ct. 1108].) The proscribed act of making false or misleading statements or omitting material facts also has been held to include lack of good faith or knowledge of the falsity or misleading nature of a statement, or materiality of an omission. (*United States* v. *Simon* (2d Cir. 1969) 425 F.2d 796; *Bank of America Nat. Trust & Sav. Ass'n* v. *Douglas* (D.C.App. 1939) 105 F.2d 100 [70 App.D.C. 221, 123 A.L.R. 1266].)

Other decisions hold that intent to do the proscribed act is enough (see, e.g., *United States* v. *Schwartz* (2d Cir. 1972) 464 F.2d 499; *United States* v. *Dixon* (2d Cir. 1976) 536 F.2d 1388) and again, with few exceptions, the decision construing section 32(a) of the 1934 Act postdate the enactment of the Corporate Securities Law of 1968.

Appellant's argument that the *Johnson* court erred in holding that the failure of the Legislature to use the word "knowingly" in section 25540 reflects an intent to create a strict liability offense does find support in the comments of former Commissioner of Corporations Robert H. Volk and Professor Harold Marsh, Jr., who had major responsibility for drafting the Corporate Securities Law of 1968. (Marsh & Volk, *op. cit. supra*, pp. 1-38 to 1-45.) They describe the *Johnson* holding as "a totally unwarranted and erroneous interpretation of Corp. Code Section 25540. . . ." (*Id.*, at p. 14-78.) They believe that section 25540 was intended to impose criminal liability only for an *intentional* misstatement.

"Corp. Code Section 25540 was copied as a shortened version of Section 32(a) of the Securities Exchange Act of 1934. The [*Johnson*] court dismisse[d] the federal cases requiring an intentional misstatement for a violation of that section, on the basis that the legislature, because it did not use the word 'knowingly' as defined in a Penal Code section, intended to punish conduct as criminal even though the defendant did not know that the statement made was false. As the persons primarily responsible for the drafting of these sections, we can state flatly that this is a purely fictional

account of the legislative intent." (Marsh & Volk, *op. cit. supra*, pp. 14-79 to 14-80, fns. omitted.)

While the views of former Commissioner Volk and Professor Marsh no doubt reflect their intent as draftsmen, in construing these statutes we must ascertain the intent of the Legislature when the Corporate Securities Law of 1968 was adopted. Their views are persuasive, however, because, by focusing on the application of section 25540 to a criminal violation of section 25401, they confirm that legislative intent with respect to criminal violations of section 25401, not section 25540 alone, is crucial.

The parties have not supplied any legislative history of Assembly Bill No. 1 (1968 Reg. Sess.), the bill which established the Corporate Securities Law of 1968, in the form of committee reports, legislative counsel analysis, or other materials shown to have been considered by either house of the Legislature, and we have found none. The Legislature was presumably aware, however, that the 1968 law was based on the federal model. It may also have been aware of the legislative history of those acts, therefore, and in that history "there is no indication that any type of criminal or civil liability is to attach in the absence of scienter." (*Ernst & Ernst* v. *Hochfelder, supra*, 425 U.S. 185, 205 [47 L.Ed.2d 668, 679].)

In considering the language and effect of section 25401, we must construe that section " 'in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' " (*Walnut Creek Manor* v. *Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 268 [284 Cal.Rptr. 718, 814 P.2d 704].) The section must be construed with reference to the entire system of regulation of which it is a part. (*People* v. *Comingore* (1977) 20 Cal.3d 142, 147 [141 Cal.Rptr. 542, 570 P.2d 723].) This mandates that we consider the regulatory scheme of the Corporate Securities Law of 1968.

The statutes with which we are concerned are found in two parts of the Corporate Securities Law of 1968: part 5 (§ 25400 et seq.) and part 6 (§ 25500 et seq.). Part 5 identifies "Fraudulent and Prohibited Practices." It identifies those "unlawful acts" that may be committed by offerors of securities or corporate insiders. Section 25401 is one of the provisions in the "Fraudulent and Prohibited Practices" part. Part 6 of the Corporate Securities Law of 1968 governs "Enforcement." It creates three methods of enforcement of the provisions of part 5 in chapters establishing the administrative enforcement powers of the Commissioner of Corporations (§ 25530), the civil liability of violators (§ 25501), and the criminal sanctions for violations

of the Corporate Securities Law of 1968 (§ 25540). Civil liability for violation of section 25401 is included in this part, as are the criminal penalties for any violation (§ 25540).

Thus, the conduct proscribed by section 25401 is subject to a three-tiered system of regulation. The prohibition on sale of securities by means of false or misleading statements or omission of material facts, like all regulatory provisions of the Corporate Securities Law of 1968, is first subject to administrative enforcement. Section 25530 gives the Commissioner of Corporations the power to enjoin the proscribed conduct and, where he deems it to be in the public interest, to seek ancillary relief on behalf of injured persons. That section now provides[15] in pertinent part:

"(a) Whenever it appears to the commissioner that any person has engaged or is about to engage in any act or practice constituting a violation of any provision of this division or any rule or order hereunder, the commissioner may in the commissioner's discretion bring an action in the name of the people of the State of California in the superior court to enjoin the acts or practice or to enforce compliance with this law or any rule or order hereunder. Upon a proper showing a permanent or preliminary injunction, restraining order, or writ of mandate shall be granted and a receiver, monitor, conservator, or other designated fiduciary or officer of the court may be appointed for the defendant or the defendant's assets, or any other ancillary relief may be granted as appropriate.

"· · · · · · · · · · · · · · · · · · · · · · · · · ·

"(b) If the commissioner determines it is in the public interest, the commissioner may include in any action authorized by subdivision (a) a claim for ancillary relief, including but not limited to, a claim for restitution or disgorgement or damages on behalf of the persons injured by the act or practice constituting the subject matter of the action, and the court shall have jurisdiction to award additional relief."

In addition, since 1981, the commissioner may seek a civil penalty of up to $2,500 for each violation of any provision of the Corporate Securities Law of 1968 or of any rule or order under the law. (§ 25535.)

An enforcement action by the commissioner to enjoin future sales by means of false or misleading statements is designed to protect the public (*People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10, 17 [141 Cal.Rptr.

---

[15]The several amendments of this section since the date of the offenses charged in this case are not relevant here.

20, 569 P.2d 125]; *People* v. *Martinson* (1986) 188 Cal.App.3d 894, 899 [233 Cal.Rptr. 617].) For that reason, it is irrelevant that the defendant knows that the statements or omissions are false or misleading. In light of the language of section 25401, it is reasonable to conclude that the Legislature did not intend to permit members of the public to be harmed by such sales simply because the offeror was unaware that his or her sales pitch was misleading. The relatively small civil penalty authorized implies that administrative enforcement of section 25401 was permissible regardless of whether a violation or threatened violation of that section was a knowing violation.

However, at the next level of enforcement, a civil action by an injured investor, the Legislature did expressly provide that recovery of damages was permissible only if the offeror was aware, or with reasonable care would have been aware, that statements by which the sale was made were false or misleading. Section 25501 provides: "Any person who violates Section 25401 shall be liable to the person who purchases a security from him or a sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), *unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission. . . .*" (Italics added.)

In this provision, one intended to supplement administrative regulation and enforcement (see *Musick, Peeler & Garrett* v. *Employers Insurance of Wausau* (1993) __ U.S. __ [124 L.Ed.2d 194, 113 S.Ct. 2085]; *Randall* v. *Loftsgaarden* (1986) 478 U.S. 647, 664 [92 L.Ed.2d 525, 542, 106 S.Ct. 3143] [one purpose for creating a private cause of action for violation of a regulatory statute is to supplement administrative regulation of the industry by deterring fraud and encouraging full disclosure of material information in securities transactions]), the Legislature has provided a limited remedy reflecting the actual loss of the purchaser, but permits that recovery *only* if the seller was aware or was negligent in failing to be aware that his representations were misleading. It would be unreasonable therefore to conclude that when the Legislature created the third tier of enforcement, criminal prosecution with sentence to state prison and/or a fine upon conviction, it intended to dispense with any element of knowledge or scienter while permitting a much greater sanction.

The question we face here is similar to that considered by the Court of Appeal in *People* v. *Calban* (1976) 65 Cal.App.3d 578 [135 Cal.Rptr. 441]. There the question was whether knowledge of the falsity of an affidavit was an element of the offense defined in former section 29218 of the Elections

Code (see now Elections Code section 29780), which provided for imprisonment and/or a fine for making a false affidavit concerning an initiative, referendum or recall petition. The court noted that other provisions of the Elections Code which prohibited the same conduct when committed by public officials and employees applied only to a person "who knowingly makes any false return, certificate or affidavit," and concluded that the Legislature could not have intended to dispense with the knowledge requirement for private persons. "We see no reason in logic or public policy why the Legislature would intend to apply a higher standard of criminal culpability—i.e., absolute liability for filing a false affidavit regardless of knowledge of the falsity—to private persons as contrasted with public officials and employees. Thus, we conclude that the omission of a knowledge requirement from [Elections Code] section 29218 was due simply to legislative oversight, and such a requirement must be implied as part of the statute." (65 Cal.App.3d at p. 585, fn. omitted.)

Similar reasoning suggests that the Legislature could not have intended to require knowledge of the falsity of a statement or materiality of an omission before recovery in a civil action was available, while permitting imposition of substantial criminal penalties on the offeror regardless of the knowledge of the offeror that statements by which a security was sold were false or misleading, or at least of the offeror's criminal negligence in failing to obtain and relate accurate information. The provision in section 25501 permitting a defendant to avoid civil liability on a showing that he or she "exercised reasonable care and did not know (or if he had exercised reasonable care would not have known)" of the false or misleading nature of a statement or omission in order to avoid civil liability, leads to a conclusion that either criminal negligence or actual knowledge also must be an element of a criminal violation of section 25401.

This construction is consistent with the rule that, in construing a statute, the court must attempt to avoid a construction that will lead to unreasonable or arbitrary results. "If two constructions are possible, that which leads to the more reasonable result should be adopted." (*People* ex rel. *Riles* v. *Windsor University, Inc.* (1977) 71 Cal.App.3d 326, 332 [139 Cal.Rptr. 378]. In this context, application of that rule of construction suggests that conduct that is more, not less, culpable is required for imposition of criminal penalties. (See *Williams* v. *Garcetti* (1993) 5 Cal.4th 561, 573-574 [20 Cal.Rptr.2d 341, 853 P.2d 507].) Moreover, since we are considering a penal application of section 24501, a statute whose language is susceptible of two constructions, the court must ordinarily adopt the construction more favorable to the offender. "The defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of

words or the construction of language used in a statute." (*In re Tartar* (1959) 52 Cal.2d 250, 257 [339 P.2d 553]; see also *People* v. *Piper* (1986) 42 Cal.3d 471, 477 [229 Cal.Rptr. 125, 722 P.2d 899]; *People* v. *Craft* (1986) 41 Cal.3d 554, 560 [224 Cal.Rptr. 626, 715 P.2d 585].)

The trial court, believing that a criminal violation of section 25401 was a strict liability offense, also assumed that, since section 25401 did not require knowledge or at least criminal negligence, a seller of a security may also become subject to criminal prosecution and punishment if statements which are true or reasonably believed to be true when made later prove to be inaccurate through no fault or lack of care of the seller. The result was that when, as here, a prosecution is based on the omission to state a material fact, the seller might be found guilty even if, at the time of the offer or sale, the seller had no reason to know that the unstated fact was or might become "material." The significance of the scienter requirement is readily apparent in a case such as this where the falsity or misleading nature of the statements by appellant and/or his employees and the materiality of the omissions were determined on the basis of events which occurred some time after appellant sold the limited partnership interests,[16] and the acquittal of defendant on related fraud and embezzlement charges reflects the jury's conclusion that he did not intend at the time he sold the securities to obtain the investors' funds by his fraudulent representations or his omissions to reveal material information.

In considering whether the Legislature intended to impose criminal penalties on a seller of securities for the failure to advise investors of facts which in retrospect might have been material in the decision to invest, but whose materiality would not have been anticipated by a reasonably competent seller, we must recognize again that the Legislature expressly declined to permit recovery in civil actions based on more egregious conduct. And, in

---

[16]In his closing argument, the prosecutor emphasized the following statements and omissions as warranting conviction under section 25401:

Neither appellant nor the prospectus advised Ms. Nordstrom that funds from the Hesperia 19 limited partnership would be transferred to Geldtco, of which defendant was half-owner; that Geldtco was to construct the improvements; and that Hesperia 19 was never formed and had purchased no property.

Ms. Evers was not told that the Reeves Street partnership funds would be used to purchase the Victorville property.

Mr. Gates was told his money would go into an individual retirement account, but the money was put into a partnership account concerning which he had not seen the prospectus.

Mr. Tellinghuisen was not told that the money he invested in the Olive Street partnership for property in Rialto would be used in Bell Gardens.

Mr. Adams was never told that the Las Gaviotas partnership in which he invested was not formed, property was not purchased, and funds invested were transferred to other accounts. The failure to tell investors that the only way defendant could pay off investors was by depositing money from other accounts was a material omission.

this context, it is noteworthy that shortly after the Corporate Securities Law of 1968 was enacted the United States Court of Appeals for the Second Circuit held that, under rule 10b-5, whether a statement made in conjunction with the sale of a security is misleading and whether issuance of the misleading statement resulted from a lack of due diligence must be based on the facts known, or which could have been known, at the time the security is issued. (*Securities and Exchange Com'n* v. *Texas Gulf Sulphur Co., supra,* 401 F.2d 833, 862-863.)

We must also recognize that other sanctions and remedies are more commonly utilized for conduct which was not contemplated at the time a party entrusts another person with property. The transfer of funds between limited partnerships which occurred here, since it was not among the purposes of the partnership or the powers of the general partner as described in the prospectus and was not authorized by the limited partners, was a breach of the partnership agreement. Had it been done with the intent to deprive the limited partners of the funds they invested, defendant might have been convicted of theft. A statute, even one which creates a regulatory offense, which criminalizes conduct on the basis of events that occur subsequent to the conduct, would be both unusual and of doubtful constitutionality.

Finally, we are mindful that "[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." (*Dennis* v. *United States* (1951) 341 U.S. 494, 500 [95 L.Ed. 1137, 1147-1148, 71 S.Ct. 857]; see also *United States* v. *United States Gypsum Co.* (1978) 438 U.S. 422, 436 [57 L.Ed.2d 854, 868-869, 98 S.Ct. 2864]; *United States* v. *Freed* (1971) 401 U.S. 601, 613 [28 L.Ed.2d 356, 364-365, 91 S.Ct. 1112] (conc. opn. of Brennan, J.); *United States* v. *Balint* (1922) 258 U.S. 250, 252-253 [66 L.Ed. 604, 605-606, 42 S.Ct. 301].) The Supreme Court has indicated that regulatory or "public welfare" offenses which dispense with any mens rea, scienter, or wrongful intent element are constitutionally permissible, but it has done so on the assumption that the conduct poses a threat to public health or safety, the penalty for those offenses is usually small, and the conviction does not do "grave damage to an offender's reputation." (*Morissette* v. *United States* (1952) 342 U.S. 246, 256 [96 L.Ed. 288, 297, 72 S.Ct. 240].)[17] It has also observed that "[w]hile strict-liability offenses are not unknown to the criminal law and do not

---

[17]In *United States* v. *Freed, supra,* 401 U.S. 601, the court upheld conviction under a regulatory statute which did not require scienter and did carry a substantial term of imprisonment (10 years). The law regulated transfer, registration, and taxation of "firearms" which the law defined to include destructive devices and hand grenades. The defendant possessed the latter in violation of the law. The court reversed a district court order dismissing the indictment for failure to allege scienter, holding that the law was "a regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly

invariably offend constitutional requirements [citation], the limited circumstances in which Congress has created and this Court has recognized such offenses, [citations], attest to their generally disfavored status." (*United States* v. *United States Gypsum Co.*, *supra*, 438 U.S. 422, 437-438 [57 L.Ed.2d 854, 867-868].)

Notwithstanding this limited acceptance of such offenses, an acceptance that is qualified by the court's refusal to permit abandonment of a mens rea requirement if the statute involves conduct that would constitute a common law malum in se offense, the court continues to express concern about the due process implications of regulatory or public welfare offenses which impose strict liability regardless of fault or awareness that the conduct is prohibited. This concern is reflected in the court's attempt, whenever possible, to imply such intent or awareness in federal statutes, and its admonition that such statutes are more likely to pass constitutional muster if they regulate dangerous activities. (See, e.g., *United States* v. *International Min'ls Corp.* (1971) 402 U.S. 558, 564-565 [29 L.Ed.2d 178, 183, 91 S.Ct. 1697]. ["Pencils, dental floss, paper clips may also be regulated. But they may be the type of products which might raise substantial due process questions if Congress did not require . . . '*mens rea*' as to each ingredient of the offense."].) The question in *International Min'ls Corp.* was whether due process permitted conviction of a defendant who did not know his act was prohibited by a regulatory statute and therefore may not have acted with mens rea. The court reasoned that the act was so inherently dangerous that any person dealing with the regulated matter (sulphuric acid) would be aware that there were laws or regulations governing their handling or possession.

In *Lambert* v. *California* (1957) 355 U.S. 225 [2 L.Ed.2d 228, 78 S.Ct. 240], by contrast, the court set aside a conviction for failure of a person convicted of a felony to register under a municipal ordinance. The court held that a conviction of a person who had no knowledge of the requirement violated due process because the conduct was wholly passive. "It is unlike the commission of acts, or the failure to act under circumstances that should

be surprised to learn that possession of hand grenades is not an innocent act." (401 U.S. at p. 609 [28 L.Ed.2d at p. 362], fn. omitted.)

In *Staples* v. *United States*, *supra*, 511 U.S. __ [128 L.Ed.2d 608, 623-624, 114 S.Ct. 1793, 1802], however, the court refused to extend *Freed*, again emphasizing that felony offenses which bear harsh punishment are not the type of "public welfare" offenses in which the court will readily dispense with a mens rea requirement when construing a statute.

Here, again, public safety is not involved and it cannot be assumed that an individual would realize that making a statement he believed to be true or failing to reveal information about acts that were not contemplated at the time a security was sold, and thus did not seem material, was criminal.

alert the doer to the consequences of his deed." (*Id.,* at p. 228 [2 L.Ed.2d at p. 231].)

More recently the court affirmed the conviction of a corporate president who failed to maintain the integrity of food products distributed by the corporation. (*United States* v. *Park* (1975) 421 U.S. 658 [44 L.Ed.2d 489, 95 S.Ct. 1903].) It did so, however, on the basis that a federal statute imposed a supervisory duty on the defendant to implement measures to avoid contamination of foodstuffs. In *Park,* therefore, the offense involved public health and safety and, while the statute may not have included a mens rea element, criminal negligence was a prerequisite to conviction.

This court has also assumed that regulatory or malum prohibitum crimes are constitutionally permissible where the purpose is to protect public health and safety and the penalties are relatively light. (*People* v. *Vogel* (1956) 46 Cal.2d 798, 801, fn. 2 [299 P.2d 850].) Other offenses are subject to the requirements of Penal Code section 20: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." Although this court has not had the occasion to consider the permissible scope of the public welfare or regulatory crime exception to the rule that some type of criminal intent or negligence is a necessary element of a criminal offense, that exception has not been applied in this state to offenses which, like section 25401, do not involve conduct which threatens the public health or safety and are punishable with lengthy prison terms. The exception continues to be restricted to crimes of the type described in *Vogel.* (See, e.g., *People* v. *Matthews* (1992) 7 Cal.App.4th 1052, 1057 [9 Cal.Rptr.2d 348] [storage of hazardous waste]; *People* v. *Martin* (1989) 211 Cal.App.3d 699, 714 [259 Cal.Rptr. 770, 86 A.L.R.4th 383] [transportation and disposal of hazardous waste]; *People* v. *Chevron Chemical Co.* (1983) 143 Cal.App.3d 50, 53-54 [191 Cal.Rptr. 537] [discharge of wastes into watercourse]; *Aantex Pest Control Co.* v. *Structural Pest Control Bd.* (1980) 108 Cal.App.3d 696 [166 Cal.Rptr. 763] [unlicensed poison].)

We have recognized, however, a "prevailing trend 'away from the imposition of criminal sanctions in the absence of culpability where the governing statute, by implication or otherwise, expresses no legislative intent or policy to be served by imposing strict liability.' (*People* v. *Hernandez* (1964) 61 Cal.2d 529, 533 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092]; . . .) Eavesdropping is not one of that class of crimes that affects public health, welfare or safety for which strict liability is most often imposed without any ingredient of intent (see *Morissette* v. *United States* (1952) 342 U.S. 246, 253-254 [96 L.Ed. 288, 295-296, 72 S.Ct. 240]; *People* v. *Vogel* (1956) 46 Cal.2d 798, 801, fn. 2 [299 P.2d 850]), and there is no other indication that

the Legislature intended to impose criminal sanctions in the absence of criminal intent." (*People* v. *Superior Court* (1969) 70 Cal.2d 123, 132 [74 Cal.Rptr. 294, 449 P.2d 230].)

We need not decide here whether it is constitutionally permissible to impose a criminal penalty of three years or a fine of as much as $10 million which is now permitted under section 25540 for omitting to advise a potential investor in a security of facts not known to the issuer to be material, or for making a representation which, unknown to the seller, was not true. It is enough to recognize that the due process implications of imposing a criminal penalty of that magnitude for such conduct are sufficient to raise a substantial question as to the validity of section 25401 if it is construed as creating a strict liability criminal offense.

We conclude therefore that knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in section 25401.[18] We presume the Legislature did not intend to enact a statute of doubtful validity. If knowledge or criminal negligence is not an element of the offense, criminal penalties would be imposed for conduct less culpable than that for which recovery in a private civil action is not permitted, an unreasonable application of the statutory scheme. For all of these reasons we conclude that when section 25401 was enacted, the Legislature did not intend to create a strict liability criminal offense. This construction is consistent with the drafters' intent and the construction of the federal law after which section 25401 is patterned.[19]

The trial court erred, therefore, in instructing that only a general criminal intent need be shown in the crime of willfully offering or selling a security

---

[18]To the extent that it is inconsistent with this conclusion, *Johnson, supra,* 213 Cal.App.3d 1369, is disapproved.

[19]This conclusion makes it unnecessary to consider appellant's argument that imposition of felony penalties for publication of commercial speech in the absence of actual or constructive guilty knowledge violates the free speech clauses of the state and federal Constitutions. (See *Smith* v. *California* (1959) 361 U.S. 147 [4 L.Ed.2d 205, 80 S.Ct. 215] [ordinance banning possession of obscene book could not constitutionally be applied to bookstore owner absent proof that defendant had knowledge of contents of book].)

It is also unnecessary to consider defendant's claim that the court erred in instructing the jury that he could be convicted as an aider and abettor on the section 25401 charge. We note for purposes of retrial, however, that petitioner appears to have been a principal in the sale of the limited partnership interests. The actual salespersons were his agents. If so, it may not be appropriate to instruct on aiding and abetting liability. (Pen. Code, § 31; see 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, § 92, p. 108 [person liable as principal if he or she "authorizes or otherwise causes a crime to be committed through the instrumentality of an innocent agent"] and *id.* § 93, p. 109 ["doctrine of *respondeat superior* . . . has no application to crimes requiring *criminal intent.* . . . Criminal liability cannot be imposed for the criminal act of the agent or servant unless the principal is a party to it, i.e.,

by means of a material misrepresentation or omitting to state a material fact, and that a person acts with general criminal intent when he intentionally does that which the law declares to be a crime.

The court also erred in instructing that if a defendant makes a material representation about conduct in the future, he must act in accordance with that representation irrespective of what his intent or knowledge was at the time the representation was made. The representations made by defendant at the time the securities were sold to which this instruction was related are unclear. The conduct that was inconsistent with those representations is also unclear as the prosecution appears to have relied not on an affirmative representation, but the failure to advise the buyers that funds would be transferred from one limited partnership to another or that loans would be made between or among them. The instruction may have been directed to the evidence that in one instance the limited partnership in which an investment was made was never fully funded and did not buy the property the investors were led to believe would be purchased.

However, for purposes of criminal liability, unless an issuer is aware or should have been aware at the time of the sale that a material representation is untrue, or knew or should have known that an unstated fact was material, he has not sold the security by means of an untrue statement of a material fact or omission to state a material fact within the meaning of section 25401. The truth or falsity of a representation and the materiality of an omission must be determined on the basis of what the seller knew or should have known at the time of the sale.

The evidence in this case suggests that it is reasonably probable that a result more favorable to appellant might have been reached absent these errors. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836-837.) The judgment of conviction on all counts charging violation of section 25401 must, therefore, be reversed.

V

DISPOSITION

The judgment is reversed.

Lucas, C. J., Kennard, J., Arabian, J., George, J., and Werdegar, J., concurred.

unless he aids and abets or commands the act."].) See also *Central Bank* v. *First Interstate Bank, supra,* __ U.S. __ [128 L.Ed.2d 119].

**MOSK, J.**—I dissent.

In 1989 the Court of Appeal in *People* v. *Johnson* (1989) 213 Cal.App.3d 1369, 1375 [262 Cal.Rptr. 366] (*Johnson*), held, "It is settled that the omission of 'knowingly' from a penal statute indicates that guilty knowledge is not an element of the offense. [Citation.] Had the Legislature intended to require proof of guilty knowledge or scienter under [Corporations Code] section 25540, it could have so stated by using the word 'knowingly.' Willfulness does not require proof of evil motive or intent to violate the law or knowledge of illegality. [Citations.]"

*A petition for review of Johnson was filed with this court, and promptly rejected with no votes of any justice to grant.* Have there been any developments in the ensuing years to justify at this late date overruling the prevailing law? The answer must be negative.

Indeed, with full knowledge of the *Johnson* rule, the Legislature in 1993 reconsidered Corporations Code section 25540 and increased the maximum fine for its violation, but took no action to include an element of criminal intent. As this court reiterated in *Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873], " '[W]hen the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction.' "

The majority seem to fail to appreciate that there are malum prohibitum crimes punishable despite the absence of criminal intent. Such crimes are generally based on the violation of statutes that are regulatory in nature and that affect innocent victims. It is clear that the purpose of the securities law is to protect the public against fraudulent—even unknowingly fraudulent—stock and investment schemes.

The legislative enactment may not be as strict in its requirements on stock promoters' liability as the majority might prefer. They find it more palatable to require a specific criminal intent. But the bottom line is that the Legislature has not seen fit to impose that requirement, either originally or in its subsequent reconsideration of the statute.

Rewriting statutes is not the function of this court. We must review those the Legislature has given us. As the *Johnson* case held (213 Cal.App.3d at p. 1375), "It is settled that the omission of 'knowingly' from a penal statute indicates that guilty knowledge is not an element of the offense." We have no right to add that element.

I further conclude that if there were any errors in the trial court's instructions, they are—in the frequent words of my colleagues—mere harmless errors.

I would affirm the judgment.

Respondent's petition for a rehearing was denied March 16, 1995. Mosk, J., was of the opinion that the petition should be granted.