[No. B179163. Second Dist., Div. Eight. Aug. 16, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ALI NIROOMANDI, Defendant and Appellant.

COUNSEL

Law Offices of Edelberg & Espina, Sherwin C. Edelberg and Claire N. Espina for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jaime L. Fuster and Lance E. Winters, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FLIER, J.**—Appellant Ali Niroomandi was found guilty by the court of unlicensed transmission of money to a foreign country in violation of Financial Code section 1823.[1] On appeal, appellant contends that he cannot be prosecuted for unauthorized transmission of money abroad because the requisite license may only be granted to corporations and, as an individual, he could not have applied for or have obtained such a license. He further contends that only an "appropriate" shareholder, director or officer of a corporation is subject to prosecution for transmitting money overseas without a license and the evidence was insufficient to show he was anything more than an ordinary employee with no real responsibility for the financial transactions at issue here. We affirm.

## FACTS

### 1. *Prosecution Evidence*

In January 2002, Los Angeles Police Detective Rene Lacasse of the Commercial Crimes Division was part of a multijurisdictional, multiagency task force investigating the flow of money and funding for terrorism. As such, Detective Lacasse was engaged in the investigation of unlicensed money transmittal businesses. In the course of that investigation, Detective Lacasse received information about companies advertising as money transmittal businesses in the Iranian Yellow Pages for the year 2000-2001. Under the listing "Currency Exchange," he found an advertisement for Ravandi Trade and Finance Company Incorporated (Ravandi) with offices listed on Wilshire

---

[1] Financial Code section 1823 provides: "Every person who violates or fails to comply with this chapter, or who, without complying with this chapter, represents that he or she is authorized to receive, or who solicits or receives, money or the equivalent for transmission to a foreign country, shall upon conviction be fined not more than fifty thousand dollars ($50,000) or shall be imprisoned in the state prison, or in a county jail for not more than one year, or be punished by both the fine and imprisonment."

All further statutory references are to the Financial Code.

Boulevard in Los Angeles, Dubai and England. The advertisement was partly in Farsi and partly in English.

Detective Lacasse searched the Web site for the California Department of Financial Institutions to determine if Ravandi was listed as a licensed transmitter of money abroad.[2] He ascertained Ravandi was not a listed licensee. Los Angeles Police Sergeant Daryoush Sameyah, certified in Farsi, translated portions of the Iranian Yellow Pages for the foreign money exchange investigation. The advertisement for Ravandi said, "Ravandi, a secure and strong bridge for contact with fellow Iranians."

Appellant was not licensed to transmit money abroad, nor was he an approved agent or employee of any licensee of the Department of Financial Institutions. In fact, no businesses were licensed to transmit money to Iran.

On March 1, 2002, Sergeant Sameyah called the number listed for Ravandi's Los Angeles office at Detective Lacasse's direction. Sergeant Sameyah spoke with appellant and asked if Ravandi could transfer some money to Iran for him. Appellant said they could facilitate the transaction and quoted Sergeant Sameyah an exchange rate. Appellant stated that for transactions between $1,000 and $5,000 there would be no fees for the transaction and that for every thousand United States dollars they would deposit 790,000 tomans[3] in the recipient's account in Iran. Appellant told Sergeant Sameyah to bring him a cashier's check payable to Ravandi and the recipient's name, information, address and bank information in Iran. Sergeant Sameyah also learned during the conversation that Ravandi's office on Wilshire Boulevard had been closed and the company had moved to Beverly Hills. Appellant indicated Ravandi's business hours were 9:00 a.m. to 5:00 p.m. Mondays through Fridays and 9:30 a.m. to 1:00 p.m. on Saturdays.

On March 7, 2002, at Detective Lacasse's direction, Sergeant Sameyah went to the Beverly Hills address on South Beverly Boulevard given to him by appellant. Appellant was sitting at a desk on the left side of the entrance. Sergeant Sameyah told appellant he wanted to send $20,000 to Iran. Appellant said he could facilitate the transaction and quoted an exchange rate. Appellant did not tell the officer he would need to receive approval or speak

---

[2] A "transmitter of money abroad" is someone who takes money from a customer and promises to send it to another country. The Department of Financial Institutions licenses and regulates transmitters of money abroad for the State of California. Licensees are required to meet a minimum level of financial responsibility, to maintain a minimum of $500,000 in capital and to post a bond of $500,000. Licensees must file quarterly financial statements of profit and loss and are subject to periodic examination. Licensees are also required to provide the Department of Financial Institutions with a list of all their agents to ensure such agents are approved by the department.

[3] The official unit of money in Iran is the rial, and a toman is the equivalent of 10 rials.

to anyone else to send the money to Iran. Appellant told the officer he should bring in a cashier's check and the recipient's information in Iran and stated it would normally take three days to complete the transaction. When Sergeant Sameyah expressed concern about the security of his money, appellant showed the officer a ledger of the transactions that he had done. Sergeant Sameyah asked appellant who owned the company, and appellant told him Javad Jhotbi Ravandi (Mr. Ravandi) was the owner.

On April 18, 2002, Detective Lacasse, posing as a potential customer who wished to send money to Iran, telephoned Ravandi's office and asked to speak with appellant. Appellant identified himself by name. Detective Lacasse indicated he wished to send $2,000 to a friend in Iran. Appellant told the detective he would accept the money to transmit; the detective could send in the money by cashier's check if he lived too far from Ravandi's office; and the money would be sent to the recipient within three days.

On April 23, 2002, appellant was arrested and search warrants were issued for the business location and appellant's residence in Rancho Palos Verdes. Detective John Williams of the Los Angeles Police Department supervised the execution of the search warrants and appellant's arrest. Financial records and ledgers in English and Farsi were seized under the warrants. At appellant's home, officers found several news articles referring to Mr. Ravandi's arrest for money laundering in England.

After being advised of and waiving his constitutional rights, appellant made a number of statements to Detective Williams. Appellant told Detective Williams that he had been an employee of Ravandi for approximately five years and had a power of attorney for the owner of Ravandi in the United States. Appellant stated the power of attorney gave him the ability to wire money from the company accounts in the United States and overseas. Appellant said that when he or one of the other employees of the company in the United States met with a client, they would receive money from the client, the name of the person in Iran who was to receive the money and the person's account information; Mr. Ravandi would call the office daily and provide the exchange rate they were to use for that day. Appellant indicated that after the funds were collected in the United States they would be deposited into the company's account and then wired to Dubai in the United Arab Emirates; once the money was in Dubai, it was transferred into Iranian currency and taken to Iran.

Appellant told Detective Williams that Mr. Ravandi did not have credit in the United States so appellant had signed the lease for the Ravandi office. Appellant stated that during the prior year Mr. Ravandi had been arrested in England for money problems and that appellant had closed the business in the

United States for approximately two months. Appellant estimated their office sent between $30,000 to $70,000 a day to Iran. He said he was paid $850 a month. It was Detective Williams's opinion this was not true based on appellant's residence, its location and the vehicles he was driving.

When Detective Williams went to the Ravandi office to serve the warrant, he observed two other employees seated behind desks. Appellant told him those employees also met with clients and received funds and the information of who were to receive the funds in Iran. Appellant told Detective Williams that appellant had the additional duties of opening and closing the office, that he had the power of attorney to wire the money, and that he would collect the funds and deposit the money. He stated that if the wire transfer was under $100,000 he could transfer the money himself, but if it was over $100,000 he would need to do it with another employee.

An audit of Ravandi's ledgers conducted by the Federal Bureau of Investigations showed Ravandi transmitted approximately $23.7 million to or from the United States during the six-month period between November 2001 and April 2002.

## 2. *Defense Evidence*

Appellant took the stand and testified in his own defense. Appellant lived in a condominium in Rancho Palos Verdes with his wife and his son. His monthly payment was $1,037 a month, and he, his wife and his son all contributed toward the payment. Appellant is a citizen of the United States and has lived in this country for over 20 years. He has a high school diploma and did not attend college.

Appellant has worked for Ravandi since June 1997. As of the time of trial, appellant was still receiving a salary from Ravandi. To explain his continued receipt of a salary, appellant testified that he called Mr. Ravandi on the telephone from home a few days after his arrest and threatened to bring a civil action against Mr. Ravandi. As a result, Mr. Ravandi offered appellant a sum of money not to sue.

Appellant testified he was hired by Mr. Ravandi's deputy from England, Mr. Mohammadi. Appellant's title was "office clerk," and he was told his duties were to answer the telephone and to receive customers coming into the office, whether in person or by telephone. Mr. Ravandi would come to the office once a year. Appellant's duties were to meet with people who wanted to send money overseas, answer the phone, open the mail, make copies of the cashier's checks and do the filing. He was a "common clerk" in the office.

Appellant admitted he signed as a guarantor on the lease for Ravandi's premises.[4] This was because, after Ravandi signed the lease and sent it back to Los Angeles, the landlord required a "local guarantor" on the document. Appellant signed the lease because Mr. Ravandi ordered him to do so. He did not receive any extra money from Ravandi for signing the document.

Appellant had held a power of attorney from Mr. Ravandi since early January 2002. Mr. Ravandi told appellant the bank would no longer allow Mr. Ravandi to carry out transactions by telephone and it would allow only people inside America to carry out transactions. The power of attorney authorized appellant to send checks to Ravandi but gave him no ownership interest in the money. When the Ravandi office had previously closed, the order came from Mr. Ravandi himself. Appellant had no authority to sign any checks except those for transmission of money to Dubai. His payroll checks were signed by a Mr. Fiouzi.

On cross-examination, appellant testified he was aware Mr. Ravandi had been arrested and that the business stayed closed until Mr. Ravandi "told us that we could do the work." Appellant continued to be paid during the time the business was closed. All three employees, including appellant, had equal authority to answer the phone when customers called. If someone told him they wanted to send money to Iran, appellant would tell them the company could do it. When customers walked into the Ravandi office, the first desk they would see was appellant's. Appellant admitted he told Sergeant Sameyah he could send money to Iran on Ravandi's behalf and did not say he had to get permission from anyone to do so. He also admitted he showed Sergeant Sameyah a Ravandi ledger when the officer expressed concern about the safety of his money and that Ravandi kept accurate records of every transaction conducted in such ledgers. Appellant stated he drove a used Lexus between his home in Rancho Palos Verdes and Beverly Hills and that he paid for the gasoline himself. He denied being paid more than $850 a month by Ravandi. Appellant admitted the power of attorney allowed him to conduct banking activities on Ravandi's behalf.

On redirect examination, appellant testified that it was Mr. Ravandi who established the office procedures. Mr. Ravandi agreed to continue appellant's benefits until his court case was over.

---

[4] The rent on the premises was $1,000 a month.

## PROCEDURAL HISTORY

Appellant was charged with unauthorized transmission of money abroad in violation of section 1823. Appellant pleaded not guilty and waived his right to a jury trial. After hearing the evidence, the trial court found appellant guilty as charged.

At sentencing, appellant asked the trial court to deem the section 1823 violation to be a misdemeanor and grant him probation.

The prosecutor asked the court to impose the middle term of two years in state prison. The prosecutor cited several factors in aggravation: Appellant occupied a position of leadership or dominance in the crime since he held a power of attorney for Ravandi, could wire money to foreign countries on its behalf and signed a lease guarantee for its Beverly Hills office. The manner in which the crime was carried out also indicated planning, sophistication and professionalism. The prosecutor argued that Ravandi was part of an elaborate international monetary transmission business; it accepted unregulated United States currency and transmitted the money to Iran by converting it to tomans in Dubai and delivering it to unverified recipients in Iran. The prosecutor contended that, as an employee of Ravandi, appellant oversaw the illegal transmission of over $23 million in United States currency to Iran, a nation whose regime is hostile to the United States of America. The prosecutor conceded that appellant had no prior criminal convictions but argued the aggravating factors clearly outweighed this single factor in mitigation.

The trial court sentenced appellant to the low term of 16 months in state prison, after continuing the sentencing hearing to allow appellant to provide additional information or to seek appellate writ relief. The court also imposed a $200 restitution fine, a $20 court security fee and a $200 parole revocation fine that was stayed pending successful completion of parole.

Appellant appealed from the judgment of conviction.

## DISCUSSION

1. *Appellant Was Properly Convicted of Receiving Money for Transmittal Abroad Since He Was Not Licensed and Was Not an Agent or Employee of Any Licensed Corporation*

Appellant contends that, as a "mere employee" of a corporation, he cannot be convicted for the unauthorized receipt of money for transmission abroad in violation of section 1823 because the statute only applies to officers and directors of corporations. We disagree. The plain language and legislative

intent of section 1823 show that it applies to every person, including individuals, who engages in the business of receiving money for the purpose of transmission abroad without a license.

▮ In interpreting a statute, our role is to ascertain the Legislature's intent. (*People v. Lopez* (2003) 31 Cal.4th 1051, 1056 [6 Cal.Rptr.3d 432, 79 P.3d 548].) In determining legislative intent, we look first to the plain language of the statute. (*Ibid.*) If the language supports more than one reasonable construction, we consider extrinsic aids, including the objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. (*Ibid.*) We must select the construction that comports most closely with the Legislature's apparent intent and avoid an interpretation that would lead to absurd results. (*Ibid.*)

▮ Chapter 14 of division 1 of the Financial Code contains the statutes regulating the transmission of money abroad. As part of this chapter, section 1800.3 requires a license to receive money for the purpose of transmitting it abroad.[5] Under section 1802, subdivision (b), "No person other than a corporation may apply for or be issued a license." ▮ Section 1823 makes it a criminal offense, punishable by a fine, imprisonment or both, for "[e]very person" who, without a license, receives money for the purpose of transmitting it abroad.

▮ Reading section 1823 in context, it is clear an officer or employee of a licensee acting as such may lawfully receive transmission money at a licensee's office on behalf of the licensee. Section 1823 must be read together with sections 1803.5 and 1800.5, subdivision (b). Section 1803.5, subdivision (a) provides that, with an exception not relevant here, "no person shall act as an agent of a licensee, or act in any other similar capacity, and no licensee shall appoint another person to act as an agent, or to act in any other similar capacity, for the receipt of transmission money on behalf of that licensee without first obtaining the authorization of the commissioner." Section 1800.5, subdivision (c), provides in pertinent part that an " 'agent' does not include any officer or employee of the licensee when acting as such at an office of a licensee." Assuming Ravandi was a qualified corporation, had applied for and had been issued a license to transmit money abroad by the commissioner, appellant could lawfully have received money for transmission abroad as an employee under that license. However, there is no evidence that

---

[5] Section 1800.3, subdivision (a) provides: "No person shall engage in the business of receiving money for the purpose of transmitting the same or its equivalent to foreign countries without first obtaining a license from the commissioner." Traditional financial institutions, such as banks, savings and loans and credit unions that are already subject to federal and state regulations are exempt from the licensing requirement. (See § 1800.3, subd. (b).)

Ravandi was a qualified corporation, the evidence established Ravandi had in fact received no such license and, in any case, no corporation was licensed by the commissioner to transmit money to Iran.

At oral argument, appellant contended that only a "control" person of Ravandi who could otherwise have secured a license for the corporation may be convicted of violating section 1823.

■ Under its plain terms, section 1823 applies to "[e]very person" who violates the law; it is not limited to "control" persons, directors or officers of corporations. That the Legislature intended "person" as used in section 1823 to include an individual is made clear by sections 113 and 115 of chapter 1 of division 1, the division of which section 1823 is a part. Section 113 defines "[p]erson" as "an individual, sole proprietorship, partnership, joint venture, association, trust, estate, business trust, corporation, limited liability company, sovereign government or agency, instrumentality, or political subdivision thereof, or any similar entity or organization." Section 115 further provides that "[u]nless the provision or the context otherwise requires, the definitions set forth in this chapter govern the construction of this division." There is nothing in the language of section 1823 excluding individuals from its application. Accordingly, we reject appellant's contention that only a "control" person, an "appropriate" shareholder, an officer or a director of a corporation may be liable for violating section 1823.

Moreover, the legislative intent supports applying section 1823 to all individuals, not just those in charge of corporations violating the law. The Legislature enacted legislation to regulate the transmission of money abroad "to protect the people of this state from being victimized by unscrupulous practices by persons receiving money for transmission to foreign countries and to establish a minimum level of fiscal responsibility and corporate integrity for all entities engaging in the business of receiving money for transmission to foreign countries without regard to the method of transmission." (§ 1800, subd. (a).) The establishment of a "minimum level of fiscal responsibility" in all persons receiving money for transmission abroad therefore is one of the prime purposes of the legislation. Consistent with the plain language of section 1823 and to effect its purposes, the statute must be read to apply to all "persons," including individuals.

To apply the statute only to corporate officers and directors would render the licensing requirement a sham and lead to absurd results. If only an unlicensed corporation and its controlling owners, officers or directors were subject to prosecution, a person receiving money for transmittal abroad could readily avoid prosecution simply by failing to incorporate.

Appellant is subject to prosecution under section 1823.

## 2. *Substantial Evidence Supports Appellant's Conviction*

■ In deciding a claim of insufficiency of evidence, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence to support the judgment such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–320 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].) Substantial evidence is evidence that is "reasonable, credible, and of solid value." (*People v. Rodriguez, supra,* at p. 11.) The test is not whether we in the first instance would find the evidence establishes guilt beyond a reasonable doubt, but whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Ibid.*)

■ Appellant contends there was insufficient evidence as a matter of law to establish he was more than a mere employee of the unlicensed corporation. In particular, he argues the evidence showed he did not own the corporation and did not make decisions respecting the business, nor did he write checks for business expenses, make payroll deductions or "authoriz[e] transfer of monies greater than $100,000." As we have discussed, *ante,* appellant's status as an employee of an unlicensed corporation does not exempt him from prosecution under section 1823. Appellant admitted that he took money from individuals to transmit to Iran.[6] The evidence established that appellant twice told Sergeant Sameyah he could take the officer's money and transfer it to Iran and that he told Detective Lacasse the same. Appellant was not an employee of or an approved agent for any licensed transmitter, nor was he himself licensed. Appellant kept a ledger showing transfers of money to Iran that he had completed and testified it was an accurate record of those transactions. The evidence established that Ravandi had transmitted approximately $23 million abroad during the six-month period between November 2001 and April 2002 and a trier of fact could rationally conclude beyond a reasonable doubt that appellant collected, deposited and wired money for transmission abroad without a license.

---

[6] At trial, appellant was questioned and answered as follows:

"Q. That's a picture of you seated at your desk at Ravandi Trade and Finance, is it not? [¶] A. Yes."

"Q. . . . Your office at Ravandi Trade and Finance is where you conducted the business of sending money to Iran on behalf of Ravandi, is it not? [¶] A. Yes."

"Q. . . . Ravandi Trade and Finance was a business, was it not? [¶] A. Yes. [¶] Q. And the purpose of the business was to make a profit, was it not? [¶] . . . [¶] [A.] That was the plan."

## DISPOSITION

The judgment is affirmed.

Rubin, Acting P. J., and Boland, J., concurred.