[Nos. B181950, B183383. Second Dist., Div. Five. Feb. 14, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
MOSTAFA NOORI et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts B. through E. of the Discussion.

**COUNSEL**

Cheryl Barnes Johnson, under appointment by the Court of Appeal, for Defendant and Appellant Mostafa Noori.

Carol S. Boyk for Defendant and Appellant Bijan Mehdipanah.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jaime L. Fuster and Lance E. Winters, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KRIEGLER, J.**—Since 1951, our Legislature has proscribed any person—other than specifically exempted financial institutions—from engaging "in the business of receiving money for the purpose of transmitting the same or its equivalent to foreign countries without first obtaining a license" from the Commissioner of the Department of Financial Institutions. (Fin. Code, § 1800.3, subd. (a).)[1] Section 1823 makes it a felony for any person who has not complied with the department's licensing requirements to represent that he or she is authorized to receive, or to solicit or receive, money for transmission to a foreign country. (§ 1823.) Following a bench trial, defendants Bijan Mehdipanah and Mostafa Noori were found guilty of violating section 1823. The trial court suspended imposition of sentence and placed Mehdipanah on formal probation, which included imposition of the maximum fine of $50,000. The trial court granted Noori's motion to reduce his conviction to a misdemeanor and imposed summary probation.

Mehdipanah and Noori were tried on the understanding that section 1823 was a general intent crime, meaning that in addition to proving that defendants lacked the requisite license from the department, the prosecution was required to prove that defendants acted intentionally in representing they were authorized to receive (or in soliciting or receiving) money for the purpose of transmitting it to a foreign country—Iran. It was also understood that there was no additional knowledge or intent element. The trial court rejected the defense contention that the prosecution was obliged to prove defendants were aware of the department's licensing requirement and made their representations or solicitations with the knowledge they were not in compliance with the Financial Code.

In the published portion of this opinion, we address defendants' argument that constitutional due process concerns require that section 1823 include the special mental state element that defendants knew they lacked the department's license at the time they committed the felony offense. Finding no statutory basis for importing such an element into section 1823 and no

---

[1] All further statutory references are to the Financial Code, unless otherwise noted.

constitutional requirement, we reject that argument. We also address Mehdipanah's closely related argument that the exclusion of testimony by defendant's business attorney deprived him of his constitutional right to present a defense. The intended testimony—to the effect that private counsel assured Mehdipanah that the business was in compliance with California law—would have contributed merely to an improper mistake of law defense, not a permissible mistake of fact defense.

In the unpublished portion of the opinion, we address Noori's contention that there was insufficient evidence to support his conviction because he was merely an employee. We reject that contention for the reasons adduced in *People v. Niroomandi* (2005) 131 Cal.App.4th 1432 [32 Cal.Rptr.3d 736]. We also address Mehdipanah's remaining contentions: (1) the prosecution engaged in discriminatory prosecution; (2) the exclusion of testimony from his private counsel deprived Mehdipanah of his constitutional right to present mitigation evidence; and (3) the sentencing court was influenced by improper evidence. We find nothing in the record to support those contentions and affirm.

## STATEMENT OF THE FACTS

A. *The Prosecution Case*

Detective Daryoush Sameyah of the Los Angeles Police Department, who was fluent in Farsi, was part of an investigation concerning the transmission of money to Iran. He was aware of an entry in the currency exchange section of the local Iranian yellow pages for "Sarafi Bijan," located on Ventura Boulevard in Tarzana. In Farsi, "Sarafi" means the exchange of foreign currency. Sarafi Bijan also had a full-page advertisement,[2] which promised the secure delivery of money to its destination. On March 1, 2002, Detective Sameyah, working undercover, telephoned the number listed in the advertisement and spoke to a person who identified himself as "Bijan." The detective asked if he could arrange to send one million tomans (an Iranian unit of currency) to Iran. "Bijan" told the detective that he could "facilitate the transaction" at a rate of 792 tomans to the dollar, plus a $20 fee.

Three days later, Detective Sameyah, still working undercover, visited the Tarzana office of Sarafi Bijan. The detective had a concealed "wire," allowing him to broadcast his conversation to officers waiting outside in a surveillance van. Inside the office, Noori was sitting at a desk by the front door. The detective told Noori that he wanted to send $20,000 to Iran. Noori gave the

---

[2] Mehdipanah first took out a full-page advertisement in 1997 for Sarafi Bijan and continued to do so through 2002.

detective a form to fill out, and the two discussed the terms of the transaction. Noori's business card represented that he was an "office worker" for Sarafi Bijan, which provided for the "payment of foreign exchange, express" in "less than one day."

The transaction form, which was written in Farsi and English, required the customer's identifying information and bank account number. Under the terms of the agreement, the customer's funds would be transferred to a bank account or delivered directly to the designated receiver. When the detective told Noori that he had $20,000 in cash to transmit, Noori informed him that Sarafi Bijan accepted no more than $2,000 in cash, so the detective would have to use a cashier's check made out to Sarafi Bijan for the transaction. Noori quoted an exchange rate to the detective and told him that it would take one to four days to complete the transaction. Noori explained that the cashier's check itself would not be sent to Iran. Rather, "We will give money in Iran to whoever you say, in Tomans."

When Detective Sameyah "expressed concern" over the level of security for his money, Noori told him that a coworker had completed approximately 50 similar transactions that day, and he suggested the detective inquire about "their reputation from the Iranian community." When the detective asked further about the safety of the transaction, Noori took him to Mehdipanah's office. Mehdipanah represented that he was "Bijan," the owner of Sarafi Bijan, but added, "We are all Bijan here."

On April 23, 2002, Detective Sameyah and other officers conducted a search of Sarafi Bijan's Tarzana office. There were between 20 and 30 customers in the office sending money to Iran.

Documents seized from Sarafi Bijan's office showed that it was engaged in the business of transmitting money to Iran. Between November 6, 2001, and April 23 2002, Sarafi Bijan transferred "just a little over $12 million" to Iran.

Arlene Rutherford, who before her retirement had worked for the California Department of Financial Institutions for 33 years, testified as an expert in state regulation of transmitters of money abroad. State regulations require that such entities obtain a license in order to engage in the business of sending money to foreign countries. A would-be transmitter must apply for a license and post a bond.

In February of 2002, the department verified for the Los Angeles Police Department that neither Sarafi Bijan nor either defendant was licensed to transmit money abroad. In fact, only corporations could be licensed for that purpose; however, a licensed corporation could apply to have persons serve

as approved agents of the entity. The department's commissioner issued a certificate that Sarafi Bijan did not have such a license. Neither Mehdipanah nor Noori was an approved agent. Indeed, at the relevant times, no entity could have obtained a license to transmit money to Iran because federal law proscribed the transmission of money to that country.

After his arrest, Noori waived his *Miranda*[3] rights and gave a statement to the police. Noori had been in the United States since 1991. He was employed by Mehdipanah for the four years leading up to his arrest. He would take three months off of work every year to spend in Iran. Apart from answering the telephones, Noori's responsibilities at Sarafi Bijan were to receive the money from customers, give them receipts, and inform them when the money had been sent to Iran. The business averaged 25 to 35 customers daily. Sarafi Bijan advertised through various media. Noori told the police that he believed Sarafi Bijan or Mehdipanah "was licensed and was able to send and receive money."

Detective Robert Cosley of the Los Angeles Police Department interviewed Mehdipanah, who waived his *Miranda* rights. Mehdipanah said he was the owner and controller of Sarafi Bijan, which was engaged in the business of sending money back and forth between persons in the United States and Iran. Mehdipanah had partners or "trusted friends" in Iran who assisted him in completing the transactions. He advertised the business in the local Iranian yellow pages. Mehdipanah's company, Sarafi International, was registered with the California Secretary of State as a limited liability corporation.

## B. *Defendants' Case*

Noori testified that Mehdipanah was a family friend. Noori worked for him part-time for about four years. He received a salary of $500 per month (less state and federal income taxes), which was paid even while Noori spent three or four months in Iran. He believed Sarafi Bijan's money transmitting business was legitimate. It advertised openly in various media and had many returning customers. There was a license on the wall; however, he did not know what kind of license it was. Mehdipanah told Noori that the business was licensed.[4] Noori admitted that when Detective Sameyah came to visit the business, Noori told him that Sarafi Bijan could transfer money to Iran for him, and that it did so regularly. Noori had customers fill out money transmission forms as part of such transactions more than one thousand times

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

[4] Detective Sameyah confirmed that when he interviewed Noori after his arrest, Noori said that "he believed that what he was doing was legal" and that Sarafi Bijan was a properly licensed business.

in the course of his employment. The first time the department informed Noori that a license was required to conduct Sarafi Bijan's business was 40 days after his arrest.

Mehdipanah testified that after immigrating to the United States from Iran, he worked for Rivandi Money Exchange, a business engaged in transferring money abroad. In 1997, when Mehdipanah left the Rivandi business, he retained a lawyer named Cyrus Meshki to help him set up his own business to transfer money to Iran. Mehdipanah wanted it to be legal. Meshki formed Sarafi International, LLC, in accordance with California law. Meshki knew that the business would be engaged in transferring money to Iran. Mehdipanah received an employer identification number for the purpose of "money exchange, trade, and financial services."

In early 1998, Mehdipanah received a letter from the United States Treasury Department concerning his business. Mehdipanah was copied with the letter Meshki wrote back to the Treasury Department to the effect that the business "had gotten all your proper licenses." The business had a license from the City of Los Angeles, which Mehdipanah posted in the Tarzana office. At that point, however, Mehdipanah's business had not received a license from the Commissioner of the Department of Financial Institutions. It was not until the month after his arrest that Mehdipanah received a communication from the department informing him of the licensing requirement. Mehdipanah retained Meshki to attempt to obtain the necessary licensing. They met with the department's personnel for that purpose.

## DISCUSSION

A. *Section 1823 Is a General Intent Crime That Does Not Require Specific Knowledge of Noncompliance with the Licensing Requirement*

To determine the meaning of section 1823, and whether it mandates knowledge of the licensing requirement to support a conviction, "we look to the intent of the Legislature in enacting the law, 'being careful to give the statute's words their plain, commonsense meaning. [Citation.] If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary.' [Citation.] Additionally, we must interpret section [1823] in context with the entire statute and the statutory scheme." (*In re Jennings* (2004) 34 Cal.4th 254, 263 [17 Cal.Rptr.3d 645, 95 P.3d 906] [construing Bus. & Prof. Code, § 25658, subd. (c)].)

Section 1823 is contained in the Financial Code's comprehensive regulations for the transmission of money abroad, found in chapter 14,

sections 1800 through 1827. Section 1800 expresses the Legislature's intent, which is "to protect the people of this state from being victimized by unscrupulous practices by persons receiving money for transmission to foreign countries and to establish a minimum level of fiscal responsibility and corporate integrity for all entities engaging in the business of receiving money for transmission to foreign countries without regard to the method of transmission." (*Id.*, subd. (a).) To that end, "[t]he Legislature finds and declares that California has a large and diverse population many of whom are concerned with the financial plight of people remaining in the countries which they left. Many of these people are not familiar with the varied and intricate financial systems of this state and due to language barriers and other obstacles do not have access to entities offering legitimate money transmission services. In an effort to transmit money to their friends and relatives, these persons give their money to persons under the precept that the money or its equivalent will be immediately transmitted to the designated foreign country. The money is frequently misappropriated or never transmitted. The victims of these practices are generally not aware of the law enforcement services available to help them, thus this unlawful conduct goes unreported." (*Id.*, subd. (b).)

Certainly, those policy concerns evince nothing that would support a special knowledge of illegality requirement. The Legislature's broad consumer protection objectives would be seriously undercut, if not wholly thwarted, if persons lacking the wherewithal to safely conduct a money-transmission business—not to mention those actively desirous of exploiting consumers—had a built-in incentive to remain ignorant of our state's licensing requirements. (Cf. *People v. Niroomandi, supra,* 131 Cal.App.4th at p. 1442 [recognizing that section 1823's broad legislative intent "supports applying section 1823 to all individuals, not just those in charge of corporations violating the law"].) As the *Niroomandi* court recognized in a related context, "[t]o apply the statute only to corporate officers and directors would render the licensing requirement a sham and lead to absurd results. If only an unlicensed corporation and its controlling owners, officers or directors were subject to prosecution, a person receiving money for transmittal abroad could readily avoid prosecution simply by failing to incorporate." (*Ibid.*) Were we to accept defendants' interpretation of the statute, persons wanting to avoid compliance with our state's consumer protection regulations would effectively be granted a free pass up until the time they were given official notice of noncompliance.

■ Consideration of the overarching statutory scheme reveals no basis for importing a special knowledge element. As indicated above, section 1800.3 sets forth the general licensing requirement—"No person shall engage in the business of receiving money for the purpose of transmitting the same or its equivalent to foreign countries without first obtaining a license from the commissioner"—and lists the exempted entities. (*Id.*, subd. (a); see also

§ 1800.4.) Section 1800.5 contains various defined terms, including "Agent," which means "any person whom a licensee has appointed as its agent with authority to receive transmission money on behalf of the licensee . . . ." (*Id.*, subd. (c).) Such a person is defined so as not to "include any officer or employee of the licensee when acting as such at an office of a licensee."[5] (*Ibid.*) Other provisions concern matters such as licensing fees; the procedures for license applications, their approval, and issuance; reporting and accounting requirements for licensees; examination of a licensee's business; the deadline for forwarding a customer's money; customer refunds; security deposits; the necessity of clearly stating the exchange rate on a customer's receipt; and the process for license revocation or suspension. (§§ 1801–1802.2, 1802.7, 1807–1808, 1810–1811, 1815, 1819.)

The provision directly at issue here, section 1823, identifies no intent requirement, much less a specific knowledge of wrongfulness element: "Every person who violates or fails to comply with this chapter, or who, without complying with this chapter, represents that he or she is authorized to receive, or who solicits or receives, money or the equivalent for transmission to a foreign country, shall upon conviction be fined not more than fifty thousand dollars ($50,000) or shall be imprisoned in the state prison, or in a county jail for not more than one year, or be punished by both the fine and imprisonment."

In contrast, the Legislature chose to treat differently the issue of liability for agents *after* revocation or suspension of a license. In that context actual knowledge of the department's action is required. Section 1827, subdivision (a) provides that a licensee's agent "who has actual notice that the commissioner has suspended or revoked the license of a licensee" shall not receive any transmission money on behalf of the licensee. "If any agent of a licensee, after first having actual notice that the commissioner has suspended or revoked the license of a licensee . . . receives any transmission money on behalf of the licensee, the agent shall be jointly and severally liable with the licensee for the timely and proper delivery of transmission money received by the agent of the licensee." (*Id.*, subd. (b).)

The Legislature's decision to condition an agent's liability on actual notice in circumstances following license revocation or suspension, while making no analogous requirement in circumstances concerning liability for persons involved in transactions where there was never a license, provides

---

[5] Thus, as the *Niroomandi* court explained, if Sarafi Bijan had been a qualified corporation and had applied for and had been issued a license to transmit money abroad by the commissioner, Noori "could lawfully have received money for transmission abroad as an employee under that license." (*People v. Niroomandi, supra,* 131 Cal.App.4th at pp. 1441–1442.)

strong evidence that it deliberately chose not to include an additional knowledge element for purposes of section 1823. " 'It is a settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes.' " (*In re Jennings, supra,* 34 Cal.4th at p. 273, quoting *People v. Norwood* (1972) 26 Cal.App.3d 148, 156 [103 Cal.Rptr. 7].)

■ The fact that no intent requirement is specified does not require the inference that the statute is one of strict liability. "The prevailing trend in the law is against imposing criminal liability without proof of some mental state where the statute does not evidence the Legislature's intent to impose strict liability." (*In re Jennings, supra,* 34 Cal.4th at p. 267.) "For criminal liability to attach to an action, the standard rule is that 'there must exist a union, or joint operation of act and intent, or criminal negligence.' (Pen. Code, § 20.) '[T]he requirement that, for a criminal conviction, the prosecution prove some form of guilty intent, knowledge, or criminal negligence is of such long standing and so fundamental to our criminal law that penal statutes will often be construed to contain such an element despite their failure expressly to state it. . . .' [Citations.]" (*Ibid.*) Given that a section 1823 violation is a felony that carries a presumptive prison term of two years' imprisonment (see Pen. Code, § 18), and there is no specified Legislative intent to impose strict liability, we assume—as the prosecution and the trial court did—that the general criminal intent requirement applies.

■ Contrary to defendants' assertions, however, this presumptive mens rea requirement is not the same as knowledge of illegality. "As our Supreme Court explained in *People v. Daniels* (1975) 14 Cal.3d 857, 860 [122 Cal.Rptr. 872, 537 P.2d 1232], ' "[w]hen the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." [Citation.]' (Quoting *People v. Hood* (1969) 1 Cal.3d 444, 456–457 [82 Cal.Rptr. 618, 462 P.2d 370].)" (*People v. Ramsey* (2000) 79 Cal.App.4th 621, 632 [94 Cal.Rptr.2d 301].)

■ Under section 1823, persons who lack the required license act with general criminal intent if they intentionally either represent themselves as being authorized to receive—or solicit or receive—money for transmission to a foreign country. Under the accepted rules of statutory construction, including the additional mental state element of knowing that one's actions are illegal

requires a specified legislative intent. ■ " '[K]nowledge of the unlawfulness of an act or omission is not required *unless* the Legislature has specifically decreed otherwise.' " (*People v. Ramsey, supra,* 79 Cal.App.4th at p. 632, quoting *People v. Honig* (1996) 48 Cal.App.4th 289, 336–337 [55 Cal.Rptr.2d 555]; see also *People v. Taylor* (1992) 7 Cal.App.4th 677, 692 [9 Cal.Rptr.2d 227] [" ' "California case law has long held that the requirement of 'knowingly' is satisfied where the person involved has knowledge of the facts, though not of the law. [Citations.]" ' [Citations.]"].)

Nor do we find that due process requires the recognition of such a special knowledge element. Defendants' argument is premised on the mistaken notion, discussed above, that section 1823 would function as a strict liability offense unless it included a special knowledge of illegality element. Moreover, in none of defendants' authorities was due process found to require proof that the defendant knew the proscribed conduct was illegal. Rather, in all the cases on which defendants rely, the vice in the statutes was that it did not require the prosecution to prove that the defendant intended to commit the statutorily proscribed conduct.

In defendants' primary authority, *People v. Simon* (1995) 9 Cal.4th 493 [37 Cal.Rptr.2d 278, 886 P.2d 1271], our Supreme Court held that "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in [Corporations Code] section 25401"—making false statements or material omissions in the sale of a security. (*People v. Simon, supra,* 9 Cal.4th at p. 522.) In *Simon,* the trial court had instructed the jury that a defendant could make a material representation about future conduct, regardless of his intent or knowledge at the time the representation was made. (*Id.* at p. 508.) The Supreme Court reversed and held that the elimination of any knowledge element, which effectively created a strict liability offense with a potential criminal penalty of three years or a fine of as much as $10 million, raised serious constitutional concerns. (*Id.* at p. 522.) The *Simon* court therefore held that "for purposes of criminal liability, unless an issuer is aware or should have been aware at the time of the sale that a material representation is untrue, or knew or should have known that an unstated fact was material, he has not sold the security by means of an untrue statement of a material fact or omission to state a material fact within the meaning of [Corporations Code] section 25401." (*Id.* at p. 523.)

■ In contrast, here, the prosecution was required to prove that defendants intentionally either represented that they were authorized to transmit money to Iran, or solicited money for transmission to Iran. That is, defendants were required to know that they were engaged in the business of transmitting money from California to a foreign country. Moreover, such a

general intent theory permitted the possibility of a mistake of fact defense—that defendants believed Sarafi Bijan had been duly licensed by the department. (See *People v. Hernandez* (1964) 61 Cal.2d 529, 535 [39 Cal.Rptr. 361, 393 P.2d 673] [" ' "At common law an honest and reasonable belief in the existence of circumstances, which, if true, would make the act for which the person is indicted an innocent act, has always been held to be a good defense." ' "]; *In re Jennings, supra,* 34 Cal.4th at p. 279; *People v. Young* (2001) 92 Cal.App.4th 229, 233 [111 Cal.Rptr.2d 726].) Our holding is consistent with the recent decision in *People v. Salas* (2006) 37 Cal.4th 167 [38 Cal.Rptr.3d 624, 127 P.3d 40 ], which held that guilty knowledge was not an element of the general intent crime of selling an unregistered security (Corp. Code, § 25540, subd. (a)), but a defendant's reasonable good faith belief that the security was exempt from registration would be an affirmative defense on which the defense bears the initial burden of proof.

Mehdipanah errs, however, in asserting that the trial court prevented him from presenting a viable mistake of fact defense when it refused to admit testimony by Meshki, Mehdipanah's private attorney. Meshki would not have testified that he told Mehdipanah that the requisite license had been obtained for Sarafi Bijan from the department. Rather, the gist of Meshki's anticipated testimony was that he gave Mehdipanah reason to believe that the business was generally in compliance with state law—that Meshki had obtained all the licenses he believed were necessary for the business to operate legitimately under California law. Indeed, Mehdipanah testified on his own behalf that he believed Meshki formed Sarafi International, LLC in accordance with California law, and that prior to Mehdipanah's arrest, Meshki wrote to the United States Treasury Department to the effect that the business "had gotten all your proper licenses." However, Mehdipanah made it clear that neither he nor Meshki was aware of the department's licensing requirement under section 1800 et seq., until after Mehdipanah's arrest.

As such, Meshki's testimony would have contributed merely to an improper mistake of law defense, not a permissible mistake of fact defense. "As a general matter . . . , a mistake of fact defense is not available unless the mistake disproves an element of the offense." (*In re Jennings, supra,* 34 Cal.4th at p. 277.) Stated another way, "a mistake of law is not a defense to a general intent crime, but in some circumstances it may be a defense to a specific intent crime." (*People v. Ramsey, supra,* 79 Cal.App.4th at p. 632; see *People v. Vineberg* (1981) 125 Cal.App.3d 127, 137 [177 Cal.Rptr. 819].) We have held that knowledge of the department's licensing requirements is not an element of a section 1823 offense. Accordingly, evidence that Mehdipanah acted under the good faith belief that his business required no additional licenses—that Mehdipanah believed his conduct was legal—would not have served to negative any element of the charged offense. (See *People v. Ramsey, supra,* 79 Cal.App.4th at pp. 632–633 ["Despite occurrence of the terms

'intentionally' and 'knowingly,' Water Code section 13387 does not expressly indicate that knowledge that a material is a pollutant is an element of the offense, and thus a mistake of law concerning this matter is not a defense."].)

■ As Justice Story explained nearly two centuries ago, "is a common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." (*Barlow v. United States* (1833) 32 U.S. 404, 411 [8 L.Ed. 728].) Our courts have consistently endorsed that principle. "It is an emphatic postulate of both civil and penal law that ignorance of a law is no excuse for a violation thereof. Of course it is based on a fiction, because no man can know all the law, but it is a maxim which the law itself does not permit any one to gainsay. It is expected that the jury and the court, where it is shown that in fact the defendant was ignorant of the law, and innocent of any intention to violate the same, will give the defendant the benefit of the fact, and impose only a light penalty. [Citations.] The rule rests on public necessity; the welfare of society and the safety of the state depend upon its enforcement. If a person accused of crime could shield himself behind the defense that he was ignorant of the law which he violated, immunity from punishment would in most cases result. No system of criminal justice could be sustained with such an element in it to obstruct the course of its administration. . . . The denser the ignorance the greater would be the exemption from liability." (*People v. O'Brien* (1892) 96 Cal. 171, 176 [31 P. 45]; see *People v. Young, supra,* 92 Cal.App.4th at p. 234, citing *People v. Costa* (1991) 1 Cal.App.4th 1201, 1211 [2 Cal.Rptr.2d 720]; *People v. Mayer* (2003) 108 Cal.App.4th 403, 413 [133 Cal.Rptr.2d 454], citing *People v. Snyder* (1982) 32 Cal.3d 590 [186 Cal.Rptr. 485, 652 P.2d 42].)

■ Therefore, in excluding Meshki's irrelevant testimony, but imposing a relatively light sentence on Mehdipanah, the trial court appeared well aware of this maxim and its proper application.[6] It follows that Mehdipanah suffered no violation of his constitutional right to present a defense. Generally, application of the ordinary rules of evidence does not infringe on a defendant's right to present a defense. (E.g., *People v. Frye* (1998) 18 Cal.4th 894, 945 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 [31 Cal.Rptr.2d 321, 875 P.2d 36]; see *Taylor v. Illinois* (1988) 484 U.S. 400, 410 [98 L.Ed.2d 798, 108 S.Ct. 646] ["The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."].)

---

[6] We note that the trial court granted Noori's motion to reduce his conviction to a misdemeanor and imposed only summary probation. As the evidence showed that Noori was merely Mehdipanah's employee, the trial court's discretionary exercise of additional leniency in Noori's favor made much sense.

B.–E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments as to both defendants are affirmed.

Turner, P. J., and Armstrong, J., concurred.

The petition of appellant Mostafa Noori for review by the Supreme Court was denied May 10, 2006, S142295. George, C. J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 964.